# STATE v. JARRETT.

No. 7066. Decided December 15, 1947. (187 P. 2d 547.)

See 23 C. J. S., Criminal Law, sec. 1449. Separation of jury in criminal case, see note, 79 A. L. R. 821. See, also, 53 Am. Jur. 629.

*P. N. Anderson,* of Nephi, for appellant.

*A. John Brennan,* of Salt Lake City, and *Grover A. Giles,* Atty. Gen., for respondent.

LATIMER, Justice.

William Stanley Jarrett, defendant herein was convicted by a jury of the crime of branding a steer belonging to Herbert H. Winn, with intent to steal the same. The statute

involved in the prosecution was Section 103-34-8, U. C. A. 1943, which provides as follows:

"Every person who marks or brands, or who alters or defaces the mark or brand on any horse, mare, gelding, colt, jack, jenny, mule, bull, ox, steer, cow, calf, sheep, goat, hog, shoat or pig belonging to another, with intent thereby to steal the same, or to prevent identification thereof by the true owner, shall be punished as in cases of grand larceny."

After the state had completed the presentation of its evidence, both parties rested, and the matter was submitted to the jury on the evidence as testified to by witness for the state.

Appellant presents and argues twelve assignments of error; however, only two are deemed of importance to a proper disposition of this appeal. The first is, did the court err in refusing to direct a verdict of "not guilty," because of insufficiency of the evidence to justify a submission of the cause to the jury? The second is, did the court err in refusing to grant a new trial?

The first assignment of error requires a resume of at least part of the state's evidence. Mr. Herbert H. Winn, the complaining witness, testified that he was the owner of the mother of the steer in question, and she was a "Black Bally." The calf was born the first part of April, 1945, in his yards in Nephi, Utah. It was kept there for from two to three weeks when it was moved to his farm in the same town. It remained at the farm until late in May, 1945, when it was moved to the Uintah National Forest. Prior to the time it was placed on the reservation it was branded on the right hip with the Winn brand (an "S" with a three-quarter box over it), was tagged in the right ear with an ear tag and was castrated by the use of clamps. After being taken to the National Forest, the animal was not seen by the owner until early in October of 1945. At this time it was in a corral of the Nephi Cattle Association, having been rounded up with other cattle ranging on the forest land and driven to Nephi by riders of the association. Mr. Winn at this

time went to the corral to identify his cattle, noticed the ear tag was missing from the calf involved, parted the hair to make sure of his brand on the right hip, and after satisfying himself of his ownership had the steer taken to his farm. In November of the same year all the calves owned by Winn were rounded up, it was discovered that he was one short, and it was determined the calf in dispute was the one that was missing. The next time the calf was seen by Mr. Winn was some seven months later, in June 1946, and it was then located on the defendant's premises. These premises were contiguous to land owned by Winn. Both the defendant and the complaining witness Winn used a creek running through their properties to water stock, and the calf was first seen near this creek. The calf was identified as the one owned by Winn, and it bore the brand of Winn on the right hip and the brand of the defendant on the left rib. It was a common average steer in fair flesh. Both brands were visible, although the hair had grown over the Winn brand, but had not grown over the Jarrett brand. At the time the calf was discovered on the Jarrett property, the Winn brand was almost twice the size of the impression made by the branding iron used in the original branding. This was due to the growth of the calf between branding and the time of the discovery of the animal in defendant's pasture. Upon discovering the animal, Winn contacted the sheriff who came down to the pasture and observed the calf. The animal was then caught and taken to the home of Winn and has been kept there since. In July, 1946, Winn had a conversation with the defendant in which the defendant stated in substance: That he (defendant) had talked to the sheriff about the calf; that he. could not figure out how it had happened as he never branded the steer; that he would be willing to give Winn the calf, all the winter's feed and call it square if Winn would do that; that he did not want a report to get out; that he had leased a meadow to the Cattle Association and a bunch of strays were put in by the association before he got his cattle out; that it was possible the calf had been put in the meadow by the association; that he might have

taken it with his cattle, and if so it was a mistake. Upon being told by the witness Winn that this was impossible because the calf had not been returned from the range at that time, the defendant then asserted that maybe it was one of four bulls he was keeping to have examined by a Major Henderson for breeding purposes; that he had put a brand on one of them; that he had been advised by the Major that the bulls were not too good for breeding and it would be better to clamp them and use them for next year.

Mr. Raymond A. Jackson testified to the following facts: He was deputy sheriff of Juab County. He picked up Mr. Winn in Nephi and proceeded to the old creek where Mr. Winn's property is located. The steer was just over the fence on Mr. Jarrett's property. As he approached the steer he noticed an open box "S" brand on the right hip. This brand was noticed by him when he was 50 steps away from the steer. When the steer was turned around, there was a spectacle brand on the left rib (Jarrett's brand). The ears of the steer were marked by a crop and slit and an ear tag was in the right ear with the name William S. Jarrett inscribed thereon. There was a hole in the right ear that impressed him with the fact that an ear tag had been there but had fallen out. He compared the symbol on the Winn branding iron with the brand on the steer and the latter was about twice the size of the former. After having qualified as having had considerable experience in branding cattle, he described the appearance of the two brands, gave his opinion that the Winn brand had been put on first, and assigned his reasons for so concluding. He was familiar with emasculation, and in his opinion the steer was emasculated when it was around two to four months of age. He had a conversation with the defendant about the middle of July in which the defendant stated in substance: That the calf was from one of his pure bred cows; that there were about 14 calves from his cows, four of which were steers and this calf was one of the steers; that defendant asked why he, the deputy sheriff, had called him, and upon being told that it was about a steer and after the deputy had described the

animal the defendant stated that he was missing that steer; that he had branded him in 1945; that after the deputy had told him he could not have put that brand on in 1945, then the defendant said it was one of the pure breds he was holding for Major Henderson to judge; that he had waited to mark the steers until after the Major had seen them and that they were inspected by the Major in the spring of 1946.

Other witnesses were called by the state and, with the exception of the conversations referred to, corroborated most of the evidence detailed above. In addition, testimony was given by them to show the characteristics of the steer, the difference between the breed of the calf and a pure bred, the time and effect of castration, the confirmation of the steer, the relative size and appearance of the brands, the detectability of the Winn brand by sight and palpation, and the relative time of branding. In all instances the witnesses claimed the Jarrett brand was placed on the steer after the Winn brand. Some witnesses testified more favorably for the defendant than did others in connection with the appearance of the Winn brand; that is, according to some, the hair had grown over the brand. However, the witnesses testified that they had no difficulty in observing the brand even though the hair had grown over.

On cross-examination the deputy sheriff testified that he was somewhat confused about the full extent of the conversation with the defendant. In addition, appellant points out minor discrepancies between the testimony given by some of the witnesses at the trial and that given at the preliminary hearing. However, these uncertainties and inconsistent statements go only to the credibility of the witnesses, and to the weight to be given to their testimony. These are properly matters for the jury's determination, and we assume were considered by the jury during its deliberation.

The evidence is unquestionably sufficient to establish the following facts: That the steer was branded with the brands of both the defendant and the witness Winn; that the brand of Winn was first put on the steer, and that Winn was the

owner of the animal. If there is any dispute in the evidence or in the inferences deducible therefrom the dispute could only be on the question of the intent to steal.

Taking into account all competent evidence, the question of intent to steal was rightly submitted to the jury. The following facts shed light on defendant's intent. Before being arrested, the defendant told conflicting and contradictory stories to Winn and the deputy sheriff as to how the calf may have came into his possession and how it may have been branded by him with his brand. After having talked to the deputy sheriff and after having seen the animal with the brand clearly visible, his versions to Winn were in substance that he never branded the steer; that he couldn't account for the branding, as it must have been a mistake; and that the animal might have been turned into his meadow by the Cattlemen's Association and branded along with his other calves. When confronted with the statement that this was impossible because the calf was on the reserve, he then asserted it might have been branded by him as one of four bulls being held for inspection by Major Henderson. These were apparently branded in 1946. The inconsistency of the claim that he branded the calf as one of four pure-bred bulls in 1946 is apparent, if the jury believed the testimony of the state's witnesses that the steer had been emasculated in May, 1945, when very young, that it was peaked and of poor quality and light of build in the hind quarters. One of defendant's versions to the deputy sheriff was that he branded the animal in 1945. When the sheriff suggested the impossibility of this the defendant then made the claim that he branded one of the four bulls being held for Major Henderson, and "maybe this critter was the one."

The statements made by the defendant not only appear to be inconsistent with evidence given by the state's witnesses, but are in part inconsistent with each other. If, as he first claimed to the deputy sheriff, he branded the animal in 1945, this is inconsistent with his story to Winn that he never branded the steer. The latter statement is

inconsistent with another of his versions to the sheriff that he branded one of the bulls he was holding for examination and maybe this was the one.

If the jury believed the testimony that the Winn brand on the calf was detectable by sight and palpation; that the hole for the ear tag was discernable without difficulty; that the steer had been castrated when very young; and that it was of poor quality it could reasonably find that a cattleman of defendant's experience could not have mistakenly branded the calf believing it was one of his own.

As was said by this court in the case of *State* v. *McNaughtan*, 92 Utah 114, at page 119, 66 P. 2d 137, 139:

"We have considered all the cases cited by defendant, and we find none where it was held insufficient to show intent to steal where there was evidence tending to show that defendant did mark as his what the jury could readily infer he must have known was not his. In *State* v. *Chynoweth*, 41 Utah 354, 126 P. 302, the calf which was branded by defendant had no marks on it. Moreover, there was evidence of statements made by and conduct of the defendant in the presence of those at the corral when he was accused of being a 'sheep thief,' and statements made by him to Wm. H. Siddoway, which had some tendency, taken with the remainder of the testimony, to show that he was guilty."

We have not overlooked the evidence that might be considered by the jury as favorable to the defendant. Apparently no attempt had been made by anyone to obliterate the Winn markings; while the ear had been marked with defendant's slit, the hole for the ear tag was still present in the ear; the animal was found in the pasture contiguous to property owned by the complaining witness after having been missed for some seven months; certain of the witnesses testified the Winn brand had been haired over; and the fences between the land of the defendant and the complaining witness were not in a good state of repair. These are all elements the jury could consider in determining appellant's intent to steal, but when considered in connection with the other evidence were not sufficient to require the court to direct a verdict in appellant's favor. The court did not err in submitting the case to the jury.

Appellant's assignment of error concerning the trial court's failure to grant a new trial raises two principles only that need be discussed. The first is that the jury received out-of-court communications referring ■ to the cause. The second is jury separated without leave of court after retiring to deliberate upon the verdict.

The first contention can be disposed of with little comment. The affidavits filed in support of the motion for new trial and the evidence adduced at the hearing fail to establish that any communication of any kind was passed to a juror after the submission of the cause and before verdict. The affidavit by counsel for appellant alleges upon information that he believes a son of complaining witness spoke to a juror, but there is no evidence that such a conversation did take place. The most that can be claimed in support of this assignment is that it might have been possible for a juror to have overheard a remark about the case. The affidavits merely state that when the affiants went into the men's rest room, certain unknown persons were there discussing the case. A juror then came in, but no affirmation is made that the discussion continued while he was present, that it was loud enough in tone to be heard by the juror, that the juror spoke to anyone in the rest room, or that anyone communicated with him. The affidavits set forth that certain people were gathered in the hall some distance east of where the bailiff sat. The subject of conversation is not mentioned, and the bailiff testified the jury could not have heard what was being said.

The last assignment claims prejudicial error because some individual jurors left the jury room. ■■ There is evidence in the record which would establish the following:

The case was submitted to the jury at 11:22 a. m. and the jury returned a verdict at 5:34 p. m. After having been to lunch the jury returned in a body to the court house. One juror proceeded ahead of the remaining jurors and reached the men's lavatory ahead of the bailiff. The bailiff

opened the door and observed that there were three stalls, at least two being occupied, one by a person not a juror, and one by the juror. Occupation of the third stall was doubtful, due to its being behind the door when opened. The bailiff stood by the door where he could both see at least part of the juor at all times and could have heard any conversation. The juror spoke to no one and no one spoke to the juror. During the afternoon there were possibly seven jurors who went to the lavatory. Three of these seven jurors went after a verdict had been reached. With the exception of the time when the one juror went into the lavatory right after lunch, there was no one in the lavatory when the jurors were permitted to go in. The bailiff stood by the door when jurors used the lavatory facilities and could see them or hear any conversation had there been any. Both the jury room and the lavatory are on the west side of the building, separated by a hallway running east and west. The doors of the jury room and the lavatory are directly opposite each other. The bailiff sat some 16 feet east of the west wall so that he blocked entrance to either place, and no one could come down the hall and enter the lavatory or jury room without passing him. The only time he left the hallway was when he reported to the judge that the jury had returned a verdict. Before doing this he locked the door to the jury room and all members of the jury were in the room.

There were some discrepancies in the testimony given by the bailiff and that contained in the affidavits, and the bailiff was uncertain about the number of jurors that used the lavatory facilities during the afternoon. However, there is no evidence in the record that any juror conversed with anyone at any time after submission of the case to the jury, and the trial court expressly found that the state had shown by direct evidence that no prejudice was committed.

No evidence having been adduced that anyone conversed with a juror during the deliberation, can prejudice be presumed because the jurors separated? Section 105-32-32, U. C. A. 1943, provides as follows:

"After hearing the charge, the jury may either decide in court or may retire for deliberation. If they do not agree without retiring, an officer must be sworn to keep them together in some private and convenient place, and not to permit any person to speak to or communicate with them, nor to do so himself, unless by order of the court, or to ask them whether they have agreed upon a verdict, and to return them into court when they have so agreed, or when ordered by the court."

It will be observed that there are in effect two requirements: (1) That the jury be kept together in some private and convenient place; and (2) that no one be permitted to speak or communicate with the members without permission of the court. The evidence indicates there was no violation of the latter prescription, and in this respect this case is different from *State* v. *Thorne,* 39 Utah 208, 117 P. 58. In that case the juror carried on a telephone conversation with a third party and this court held that where it affirmatively appeared that a juror had wrongfully conversed with a third party the burden was on the state to show that the subject of the discusion did not prejudice the defendant. That rule can have no application here where no conversation was indulged in.

Not every separation of a juror gives rise to a claim of prejudice. Absolute isolation is not reasonably possible. When jurors are required to deliberate over long periods of time they must be permitted the liberty of visiting lavatories. Cases from most jurisdictions in this country have announced the doctrine that it is proper to permit jurors to separate from their associates to visit a lavatory if in charge of an officer to prevent their communicating with third parties. The right to separate under these conditions has been recognized. It is conversations with third parties that are condemned. While the defendant has the right to a reasonable guarantee against improper influence, he does not have the right to require unreasonable imposition on the members of the jury.

Many cases could be cited upholding this rule. We have selected two that aptly state what we believe to be the correct principle and the rule we elect to follow.

In the case of *United States* v. *Davis,* 103 F. 457, 469, the Circuit Court, Western District of Tennessee, said:

"* * * The legal right is to have a reasonable guaranty against improper influence; and the jurors may, under an officer, attend to their necessities. He need not indecently watch them, nor irksomely hamper them by disagreeable eavesdropping, when they are engaged in a presumably or apparenty harmless intercourse with those who are serving their necessities. His attendance is sufficient when it is effective to prevent opportunity for tampering with the jurors, although there may remain a possibility of furtive influence. Such a possibility it is impossible to provide against, unless a juror is confined like a felon in a cell, with a death watch set over him, and even then the possibilities are not extinct. The law requires no such strictness in any case."

The State of Missouri in the case of *State* v. *Dyer,* 139 Mo. 197, 40 S. W. 768, 770, 34 A. L. R. 1180, announced the rule in that jurisdiction as follows, page 1180:

"No pretense is made that the juror was in a situation to be approached by anyone. To this action of the court the defendant excepted. This point is mentioned simply to reiterate that exceptions of this character meet with no favor in this court. If judgments are to be reversed for reasons like this, the administration of the law would soon become a reproach of the courts. * * * The necessary separation of a juror from his fellows to attend a call of nature, under the eye of the officer of the court, is not a separation of the jury within the meaning of that term as used by our statute. To hold that it is, would be a most unreasonable construction of the law."

To hold that Section 105-32-32, U. C. A. 1943, prevented jurors from separation for purposes of necessity would be an unreasonable construction of the statute. The right of a defendant to have a jury secluded from outside influences while deliberating should be jealously ■ guarded. However, this right must not be founded on an unreasonable and unwarranted construction of a statute. The statute must be construed in keeping with the correlative rights of the defendant and the jurors.

Where the only separation of the jury is for purposes of necessity, under surveillance of the bailiff, and there is no

communication with any juror, prejudice will not be presumed. The facts of this case bring it under this rule, and appellant's assignment must fail since the burden was on him to establish that he was in some manner prejudiced by the separation. The appellant not having done so, the court did not err in overruling the motion for new trial.

The judgment of conviction is affirmed.

McDONOUGH, C. J., and PRATT and WOLFE, JJ. concur.

WADE, Justice.

I concur with the result and, except as herein stated, with the reasoning in the prevailing opinion.

The following facts were definitely shown: That the animal in question was an average range Hereford light red white bally steer and somewhat peaked or light in the hind quarters. It was born in April, 1945, from one of Winn's cows and within a few weeks thereafter was castrated, branded with Winn's brand on the right hip, Winn's ear tag placed in the under side of its right ear and sent with its mother into the mountains on the reservation. That the next October the range riders put it in the Cattle Association's corral separated from its mother where Winn and his boys identified it. At that time the ear tag was missing and the hair had grown over the brand and it was so indistinct that to make sure of their identification they roped it and parted the hair on the brand. It had developed small horns. They then took it to their lands northwest of Nephi and left it there with other cattle. This was around October 15, 1945, and in November of the same year they noticed that it was missing.

The Winn lands northwest of Nephi are close to Jarrett's land in that locality. To get to some of their lands a gate is opened into Jarrett's homestead and another gate opens into a lane about three-quarters of a mile long which ends

with a gate into Winn's property. One side of this lane joins Jarrett's property, and Winn's property to which it leads joins Jarrett's for a distance of a quarter of a mile. A creek meanders from one property to the other where both parties water their stock. The fences are not cattle proof and if they were it would be possible for this animal to have gone from Winn's land into Jarrett's through the gates without being intentionally driven.

When the Winns noticed that this animal was missing they searched through all the neighboring herds, including Jarrett's, and made inquiry about it among the neighbors but were unable to find it. Neither Winn nor Jarrett make their home on the land in question, each having a home and a plot of ground in Nephi. Jarrett owns much land in this neighborhood consisting of several different tracts.

On June 24, 1946, the Winns found this animal near the dividing line fence between their land and Jarrett's. It had then been branded with Jarrett's brand on its left ribs, it had Jarrett's ear marks on both ears, his ear tag in the upper side of its left ear and it had been dehorned. From its appearance the Jarrett brand had been placed on the animal quite recently as compared with the Winn brand; some witnesses estimated that it had been placed there within two months. Jarrett's brand was much more distinct than Winn's brand, it being free from hair, At Winn's request Deputy Sheriff Jackson went out and looked at the animal and testified that he could observe when looking for it that there was a brand on its right hip when he was 50 steps away. The animal was then taken to Winn's home in Nephi where it was examined by the deputy sheriff with four others, all experienced livestock men, including a veterinarian, besides Mr. Winn and some of his boys.

About the middle of July the deputy sheriff called Jarrett and asked him to come to the sheriff's office where he was questioned by Jackson and the county attorney. Of this conversation Jackson testified:

"'* * * Mr. Jarrett asked why I had called him to my office, and I explained that I had a steer, and explained the description of the steer to him, * * * and then he said: 'Oh, that, I am missing that steer. I branded that steer in 1945, and I am out two.'

"Then he went further into discussion about his steers being on his homestead; that he did not turn them on the reserve but the steers were on his homestead. I believe the boy had gathered some fourteen or such amount, and that he was out two steers.

"Then he went further into a discussion of a bullish steer and one that was not. *Then I told Mr. Jarrett that he could not have put that brand on in the spring of 1945.* Then he said it must have been one of the purebreds that he had been holding for Major Henderson to judge before he marked those steers.

"Then he further discussed the handling of cows, the purebred cows, and a certain amount of calves that were born, how many bull calves which I related yesterday.

"There was some discussion about this steer again, after we had been down to the Winn place and looked at the steer. We went out in my car and drove in front of Mr. Jarrett's place, * * * and he said: 'Well, if that is not the steer I branded in 1945, it must be one of the purebreds I held for Major Henderson to judge.'

"Then he stated further, that he had trouble identifying his cattle, that he was just not a cattleman, and he seemed to have trouble with his cattle, but he was sure that his boys would know which steer that was.

* * * * *

"He said in that one statement * * * that he had waited to mark those steers till after Mr. Henderson came, and that was in the spring." (Presumably the spring of 1946.) (Italics added.)

On the previous day Jackson had testified that Jarrett had said that he thought the calf was from one of his purebred cows, that he had fourteen purebred cows and had gotten four bull calves from them. At first he said he had castrated two of those bull calves and later said he had kept all four bull calves intending to register them but later on the advice of Major Henderson from the Agricultural College he had castrated and marked them.

According to Winn's testimony after Jarrett had talked with the sheriff he went to Winn's home, had talked with him about this steer and told about the same stories as he had told the deputy sheriff and in addition thereto the following:

"* * * I went out and sat down by him and we talked about the steer. He had talked to the sheriff about it, and came down a few nights before and seen it, and he could not figure out how it had happened. He said he knew he had never branded that steer, and could not figure out how it had happened, and went on with the conversation.

"* * * he and I are cousins.

"He agreed that we had had a few words, that he wanted to forget those, and start over, and he would be willing to give me the calf, * * * the winter's feed * * * and call it square, if I would do that; that he did not want it to get out; that he had been two or three years beating down the gossip that had been out once before, and he just got where he thought he could get out from that, and he did not want another one to come up."

"I did not agree to take the steer at his offer. He also said he was discouraged, and that he felt like putting himself away, * * *

"Then, in time he got back to the steer. He said he knew that I would not accuse him; that any one would know he would not brand that steer * * *.

"He said no one would know [how] it happened [that] that iron got on there, but any one would know he would not do that, *and I asked him why he had it, how he came to have it, if he had not done it.*

"Well, he rented his meadow, * * * He said at that time he had leased that to the Cattle Association for a stray pasture, and that the Association was anxious to use it, * * * that they got the first bunch of strays in the pasture before he got his out. It was possible that this calf had been put in by the association, in this pasture, and he had taken him with his, in mistake. The only way it could be it was a mistake, that is the only thing he could say at that time.

"I told him it was impossible, because I did not get the calf out of the cattle association corral till the 4th or 5th at the cattle gathering.

* * * * *

"He went on to say that he had fed it all winter, on corn silage hay and grain, but he would be willing to give it to me, and call it off, if we would call the thing square and keep down the rumors. I did not agree to that."

Deputy Sheriff Jackson also testified that when he examined the animal in June,

"there was a hole on its right ear, *close to where the slit came down.* * * * It was an oblong hole, like the steer had once been tagged and the tag had fell out." (All italics added.)

The evidence is ample and probably conclusive that this animal belonged to Mr. Winn, that it was castrated, branded and an ear tag placed in its ear when it was but a few weeks old, and that Jarrett branded, ear marked, dehorned and placed his ear tag in its ear some time between October 15, 1945, and June 24, 1946, probably late in April when the calf was just passed a year old. The only doubtful question is: Did he know when he marked the calf that it was not his and that it had Winn's brand on it? Throughout this discussion of the evidence I assume that Jarrett made the statements to the sheriff and Winn substantially as they testified, and that the facts which he purported to relate, as distinguished from the inferences which he drew from those facts, are also substantially true. I make these assumptions because I find no evidence that any of his statements of facts were incorrect, and although Jackson admitted that he was somewhat confused by Jarrett's statements, I believe that both he and Mr. Winn were honest in their testimony and that such testimony was substantially correct.

I do not agree that the statements made by Jarrett to these men shows a consciousness of guilt. I fully recognize that when a person who is accused fabricates a story which, if true, clearly exonerates him but when his story is shown to be untrue, he tells a different one, he thereby shows a consciousness of guilt. In my opinion, the defendant did nothing like that here, but on the contrary the purported facts which he related to these witnesses were probably true, and although even if true, those facts do not exonerate him from guilt he made no attempt to fabricate a better story. This fact, in my opinion, is probably the most favorable evidence in the case of his innocence.

His statements to the sheriff and Mr. Winn do not show a consciousness of guilt. When he came before the sheriff and county attorney for questioning, and the sheriff told him that he had a steer which he described, the defendant answered that it must be one of his steers which he branded in 1945, and which he was now missing. Then when the sheriff told him that he could not have branded this steer

in 1945 because his brand was too fresh he said that it must be one of his purebreds which he had not marked or castrated until the spring of 1946 after Major Henderson from the Agricultural College had advised him against keeping it as a bull for breeding purposes. It is true that he changed his theory of what animal this was and made a different statement of facts accounting for when his brand was placed on it but the reason for that is obvious. When he claimed that he branded it in 1945 he did not know that his brand had been put in it since that time, then when that fact was explained to him the only explanation he could make was that it must have been one of his purebreds which he did not brand or castrate until 1946. At that time he had not seen the animal, and was making his explanations more or less in the dark as to what animal they were talking about. But after the sheriff had taken him to see the animal he still seems to have no explanation of how his brand got on it after it had been branded by Winn, so he still insists that it must either be one which he branded in 1945 or one of his purebreds which he did not brand until later.

There is not a word in the evidence which even suggests that he did not brand a steer in 1945 which was lost at the time of this conversation, or that he did not have some purebreds which he did not brand or castrate until 1946. The weakness of his position is not that he was conscious that if he told the truth it would not establish his innocence and therefore fabricated different stories but apparently he gave the only truthful explanation there was in spite of the fact that those explanations do not establish his innocence. This suggests to me that maybe he was honest but knew of no truthful explanation which would exonerate him, and therefore he might have branded the animal thinking it was his.

Defendant's conversation with Mr. Winn was several days after he had talked with the deputy sheriff and the county attorney. At that time he was fully aware that he was facing criminal prosecution; he recognized the weakness of his claim that the animal must be his although he re-

peated the facts on which that claim was based; he then mentions that he and Winn are cousins, that they had had some words, and that defendant has spent years trying to live down some rumors, and ends by suggesting that under these circumstances no one could believe that he would brand the animal, and asks Winn to forget the whole thing and when Winn does not agree thereto, he suggests that he might commit suicide. Then Winn answers "If you did not brand this animal how did it come to be in your possession?" and defendant attempts to explain that it could have come into his possession innocently because he had rented some pasture to the Cattle Association and some of their cattle had been put into that pasture before he had taken his out and he might have driven this one out with his by mistake. But Winn answers that this could not be so because this animal did not come off the reservation until October 4th or after.

By this answer Winn seems to recognize the truthfulness of defendant's claim that he had rented a pasture to the Cattle Association, but points out a conclusive answer to the claim that defendant got the animal innocently in that manner. But this does not show guilty knowledge by telling fabricated stories, but rather shows that he stayed with the truth even though it did not exonerate him. On the question of how he came to have the animal in his possession, from the testimony of Mr. Winn it is doubtful that the dividing fence between their properties is cattle proof, and even if it were the animal might have accidentally gone through some of the gates; and according to the testimony of Mr. Winn's son, the dividing fence definitely was not cattle proof. But of course the fact that he might have gotten the animal in his possession innocently does not answer how an animal which was found in his possession with his brand on it could have been so branded by any one else.

In the face of the evidence that the animal was found in defendant's possession with his brand and ear markings, and that his brand had been placed there long after Winn's brand had been placed thereon, the evidence is sufficient to

sustain a verdict unless there are other facts in the evidence which must, to all reasonable minds, establish a reasonable doubt of defendant's guilt. There are several factors in the evidence which tend to show that the defendant did not know that Winn's brand was on the animal when he branded and ear marked it.

First, the animal was found in defendant's pasture which adjoins Winn's property. If it had been further shown that defendant had personally placed the animal in that pasture then I think it would strongly suggest that he did not realize that it carried the Winn brand. It seems evident that no one would knowingly brand an animal with intention to steal and then place it where the true owner would be likely to discover that it carried the owner's brand. But there is no showing that defendant knew that the animal was placed in that pasture; it might have been placed there by mistake, or some one else who did not know the facts could have placed it there, without his knowledge.

Next, the evidence shows that when defendant ear marked the animal there was an oblong hole in its right ear about as long as the thickness of a pencil near the end of the slit which defendant placed therein. This hole was undoubtedly placed there by Winn when he put his ear tag therein which had later fallen out. Had defendant known that such hole was there when he ear marked the animal he would have in all probability cut the slit into this hole and thereby effaced a means of identification of the animal as belonging to Winn. So it seems to me reasonable to believe that when defendant ear marked the animal he did not discover that hole, which tends to show that he also had not discovered the Winn brand, for had he known of that brand he would have been looking for this hole.

There is also the evidence that Winn's brand was quite indistinct, and that his ear tag had fallen out before the animal came into the possession of defendant. Although the deputy sheriff testified that he, when he was looking for it, observed the brand when fifty steps away, the evidence also shows that the Winns roped it at the Cattle Associa-

tion's corral to make sure that it had their brand, and there is other evidence that it was hard to see, including the testimony of one of the persons who examined it at Winn's place with the sheriff who said he tied it up in the shade and while there even though he was close to it he could not see Winn's brand except when the sun was shining on it right. Both in June and October the animal did not have its full winter coat of hair but in April when the defendant probably branded it, it would be covered with its full winter hair and the brand would be more indistinct.

On the other hand in his conversations with the officer and Winn, defendant never claimed that he branded the animal by mistake nor did he make any explanation why he branded any animal in the spring of 1946 which was more than a year old and had been castrated the previous year but had not been branded or marked at that time. The only animals which he claimed to have had which he branded in 1946 after they were a year old were the purebreds which he castrated at that time. Had there been other animals of his which he had previously castrated but not branded and marked, which he branded in 1946 he would no doubt have told the officer and Winn about them. It is possible that he did not know that he was not guilty of this offense if he branded the animal mistakenly thinking it was his own.

Besides, defendant told Winn that he had fed that animal on silage, hay and grain during the winter months. It seems improbable that he could have done that without discovering that it carried Winn's brand. From a careful study of all of the evidence, with much hesitation, I conclude that it is sufficient to sustain the verdict, that reasonable minds might conclude that there was no reasonable doubt of defendant's guilt.