355 P.2d 689

**STATE of Utah, Plaintiff and Respondent,**

**v.**

**Mack Merrill RIVENBURGH, Jr., and Leonard Warner Bowne, Defendants and Appellants.**

**No. 9089.**

Supreme Court of Utah.

Sept. 7, 1960.

Willard R. Huntsman, West Jordan, Hansen & Miller, Salt Lake City, for appellants.

Walter L. Budge, Atty. Gen., Vernon B. Romney, Asst. Atty. Gen., for respondent.

COWLEY, District Judge.

Defendants were jointly charged, tried and convicted of murder in the First Degree. The jury returned a verdict without recommendation as to defendant Rivenburgh and with recommendation as to defendant Bowne. Subsequently, Rivenburgh was given a death sentence and Bowne was granted a life sentence. Defendants were represented by different counsel and prosecute separate appeals.

Defendants were inmates of the Utah State Prison and on August 24, 1958, LeRoy Joseph Verner, also an inmate, was killed in the attic to Cell Block A of the prison. Another inmate, Jesse M. Garcia, Jr., was also involved in this homicide but was separately charged and convicted. His appeal is pending.

August 24, 1958, was a Sunday and the killing took place at approximately 8:05 p. m. Between 7 and 9 p. m. the prison conducted a movie for the inmates but the defendants and victim did not attend as well as a few other inmates in Block A who testified for the state at the trial. Defendant Rivenburgh induced the decedent to go to the attic for the purpose of an act of sodomy. Bowne and Garcia agreed to go to the attic on this occasion at the request of Rivenburgh and did so without the knowledge of Verner, preceding Rivenburgh and decedent by 10 or 15 minutes. The attic was quite dark and Bowne and Garcia went to a position in the attic where they hoped Verner would not see them. Bowne claimed at the trial that he was in the attic at the request of Rivenburgh to stand point (lookout) for him while he, Rivenburgh, accomplished the immoral act with Verner, and that he, Bowne, did not aid or abet in the killing as contended by the state. Bowne, however, told other inmates the following day that he had a

scissor's hold on Verner's head. Bowne admitted making this statement but denied it was a true fact. Entrance could be gained into the attic at the north and south end of Block A from the fourth or top tier of cells, by removing an unfastened grating in the ceiling and crawling through the hole. On this occasion the defendants entered through the south attic hole and made their exit through the north attic hole. Rivenburgh arranged for an inmate to stand point below each attic hole at the north and south end of Block A.

Each defendant had a knife in his possession when he entered the attic, although the knife Bowne had was not used in the killing. The other two knives were used, a blade type knife and a pick type Knife. When Rivenburgh and Verner arrived in the attic Verner removed his clothing and readied himself, apparently, for the immoral act, when Rivenburgh commenced cutting. Verner was severely cut in the back, arms and chest area many times with the blade type knife and the back of his neck was cut to the spinal cord. Decedent was also stabbed with an ice pick type of knife, in the back once and into the chest cavity piercing the aorta which was fatal. Defendant Rivenburgh admitted the cutting and slashing with the blade knife. Decedent was dead when he was discovered by the guards at 9:15 p. m. after it was determined that he was not in his cell at 9 p. m. ring-in. The attic was out of bounds for the prisoners but they went there from time to time for various reasons. Other facts will appear later.

■ We shall consider the appeal of defendant Rivenburgh first. Rivenburgh first contends that the verdict of murder in the first degree was not supported by the evidence,[1] and that the most he should have been convicted of was murder in the second degree. This reasoning is based upon Rivenburgh's claim that he had taken large dosages of amphetamine pills, and the effect they had upon his mental and physical condition. This constituted his defense at the trial. There was evidence in this case which showed that defendant Rivenburgh, as well as the several convict witnesses for the state, had access to, and had been using amphetamine pills (the name Drinalpha is used by the Squibb Pharmaceutical Company), from time to time. This drug had been smuggled into the prison for at least several weeks before this homicide. How and in what manner is not shown by the record, neither is it material. Rivenburgh had been taking them at various times since the middle of June, a little more than two months prior to the killing. The only evidence as to how many pills this defendant had taken on the Sunday of the murder and the few days preceding is his own uncorroborated testimony. He tes-

1. Utah Code Annotated, 1953, 77–38–3(6). (Verdict contrary to law or evidence.)

tified he had been taking them in large dosages since Wednesday. On the Sunday in question Rivenburgh testified he had taken between 55 and 60 up to 7 or 7:30 p. m., and from Wednesday to Saturday about half that amount, or a little more. Each tablet contained 5 milligrams of the drug, therefore 60 tablets contained 300 milligrams, the amount he claims he had taken on the fatal Sunday prior to the killing.

Defendant Rivenburgh argues that the large dosages of amphetamine that he indulged in would produce a pronounced effect upon his brain, causing such symptoms as tenseness, tremor, irritability, confusion and delirium, which would preclude him from being able to form the requisite intent, ability to deliberate, and premeditate the killing with malice aforethought as required to warrant conviction of first degree murder.[2]

The amphetamine drug is a stimulant and not a narcotic. It destroys appetite, prevents sleep and has a tendency to give one a "lift" or "pick up" from physical tiredness. Defendant Rivenburgh testified that 8 pills "would make you feel real sharp—after that you just get a coasting feeling—relieves you of worry and punishment—keep increasing pills as you go along—re-take them after you feel you are running down to get that charge back." Defendant claimed he took 4 or 5 at a time every hour or so. He further testified that he took them at night but couldn't sleep as a result and that he had no appetite when taking the pills. "Pills kind of exhilerated you. When on pills and pass cells you thought they were talking about you."

The convict witnesses for the state, as well as the defendant, described the effects of amphetamine as a drug which had a tendency to sharpen one, cause wakefulness, and they used such terms as "coasting," "high on pills" and "causing confusion" when used in large quantities.

In furtherance of defendant Rivenburgh's claim that the evidence does not warrant a conviction of murder in the first degree because of his excessive use of the drugs but rather that the evidence conforms more properly to murder in the second degree, counsel for Rivenburgh cites excerpts from a work called "The Pharmacological Basis of Therapeutics" 2nd Ed. by Goodman and Gilman, and also a text entitled "The Amphetamines, Their Actions and Uses," by Leake, to show the effects of overdosage of the drug which cause, according to the texts, restlessness, dizziness, talkativeness, tremor, tenseness and irri-

2. Utah Code Annotated, 1953, 76-30-3. (Degrees of Murder.) State v. Thompson, 110 Utah 113, 170 P.2d 153; State v. Russell, 106 Utah 116, 145 P.2d 1003; State v. Trujillo, 117 Utah 237, 214 P.2d 626; Warren on Homicide, Vol. 1, p. 390 (definition of murder in the second degree as relied upon by Rivenburgh).

tability, among other symptoms; and there may be confusion, delirium, anxiety and hallucination. Neither text was introduced in evidence but were referred to on cross-examination of the state's expert witness, Dr. Leonard Clarke, who testified on the effect of the amphetamines. The reference to these texts and their application to the case at bar is academic and in the abstract since it is not known how many pills Rivenburgh took, except by his own testimony and, of course, the jury would not have to believe him, but more particularly because Rivenburgh's tolerance for this drug as a habitual user is not known, and the tolerance will vary with different individuals. Dr. Clarke testified that some cases show a remarkable tolerance in the use of these drugs. The best test, therefore, to determine what effect the pills had on this defendant, is not the amount he took, even if known, but his behavior before and after the killing in question. As stated by Dr. Clarke, "The behavior is all that we have to judge by, and it would be more important than knowing the precise dose, in that there is evidence, for example, that even a very massive amount could have been taken, and no delirium occur, which we cited cases on." To the hypothetical question put to Dr. Clarke embodying Rivenburgh's behavior pattern before and after the killing, the doctor answered that he "would not regard this individual as suffering from a delirious state." Defendant did not offer an expert witness in answer to Dr. Clarke.

The testimony of Rivenburgh's activities on this Sunday was given by the convict witnesses for the state who were associated with him during the time in question, and also the defendants themselves, and there is not any evidence in the record which would lend any credence that Rivenburgh was in a confused state of mind or suffering from any toxic delirium because of the usage of said pills regardless of how many he had taken.

Rivenburgh's own testimony as to the events which occurred on the day of the homicide are clear as to details and when the district attorney asked him on cross-examination as to the effect of the pills, Rivenburgh made the following answers to the prosecutor's question, line 17, on page 634 of the transcript:

"Q. But it was the pills causing your action Sunday? A. Pardon me, sir?

"Q. That it was the pills causing your action on Sunday? A. I just got mad, sir.

"Q. You knew what you were doing Sunday, except when you got mad? A. I believe I did yes; at least I think."

We cannot help but conclude from the testimony of the witnesses for the state as

well as the defendant's testimony, that Rivenburgh's preparation for the killing by sharpening or causing knives to be sharpened, changing clothes, arranging for his co-defendants to go to the attic, arranging for point men to stand below the attic holes, and after the killing to destroy evidence, treat the cut on his chin and arrange a card game with the alibi that he had been playing cards during all the show period time from 7 to 9 p. m., and other facts not detailed, was rational conduct, and not the conduct of one who was confused or did not have full possession of his faculties. Therefore, we cannot say as a matter of law that defendant did not intend or plan with sufficient coolness to kill the deceased, as urged by defendant, and the court properly submitted to the jury the elements of first degree murder.

Defendant Rivenburgh's defense as to the effect of the drug in question on his mental condition[3] was placed before the jury under a proper instruction by the court, so the defendant had the full benefit of his defense for the jury to determine. Although the jury chose not to believe it, the evidence amply supports the verdict

■■ Defendant Rivenburgh submitted for our consideration an affidavit of each of two jurors to the effect that if the record did not support the conclusion of Dr. Clarke, the state's expert witness, then these two jurors would not have voted for the verdict. The conclusion of Dr. Clarke referred to in the affidavits stated in substance that the dosages of drugs taken by Rivenburgh did not impair his mental or physical faculties to the extent that he did not know what he was doing, or cause him to react in any abnormal manner. The general rule in this state is expressed in State v. Priestly,[4] to the effect that jurors cannot impeach their verdict except in instances expressly made exceptions by legislative enactments. The assignment of error under discussion falls under subsection (6) Utah Code Annotated, 1953, section 77-38-3, dealing with the subject of the verdict being contrary to the evidence. This is not an exception that permits a juror to impeach his verdict. Even so, the affidavits are conditional, and can be of no avail to this defendant, where the record does bear out and justifies the verdict of murder in the first degree.

■ Defendant Rivenburgh also claims that a certain hypothetical question propounded by the District Attorney to Dr. Clarke which the court permitted to be answered over objection constituted prejudicial error. Defendant contends first, that the hypothetical question was based on assumptions not then in evidence. This is not true. All the facts set forth in the hy-

---

3. Utah Code Annotated, 1953, 76-1-22. (Intoxication—in this case by use of drugs.)

4. State v. Priestley, 97 Utah 158, 91 P. 2d 447.

pothetical question had previously been testified to unless, possibly, one or two minor facts which were not important. The fairness of a hypothetical question is largely a matter resting in the discretion of the trial court, whose ruling thereon will not be grounds for reversal in the absence of a showing of abuse of such discretion.[5] The trial court did not abuse its discretion and properly admitted the hypothetical question on this ground.

■ Defendant Rivenburgh further claims prejudicial error because one part of the hypothetical question as propounded charges whether the defendant had the ability to determine between right and wrong. The Doctor answered that the defendant had the ability to know the difference between right and wrong. Defendant argues that this is the test for insanity and not the test for the degrees of murder. Although the plea of insanity was not in issue, the mental condition of the defendant, whether he knew or did not know what he was doing at the time in question in arranging and perpetrating this murder, was in issue. As to this issue, defendant claimed that the excessive use of the Drinalfa drug caused confusion of mind and toxic delirium. The hypothetical question was in two parts and the other part elicited from the doctor that the defendant was not in a delirious state, which

was based upon Rivenburgh's behavior pattern as heretofore discussed. Whether defendant was confused, suffering from toxic delirium, knew the difference between "right and wrong," had full possession of his faculties, or knew or did not know what he was doing at the time in question, was all related and material to the issue involved, the mental condition of the accused. Therefore, it was not error to propound the question of "right and wrong," and the jury could not have possibly been misled by it. Defendant cited no authorities for his contention, and we hold that no prejudicial error was committed.

Defendant Rivenburgh's last assignment of error pertains to Bowne's opening statement to the jury. Counsel for Bowne told the jury in his opening statement in substance, that Rivenburgh was a hardened criminal 29 years of age, had spent about 10 years of that time in penal institutions, while Bowne was 19 years of age and had spent only 1 year in prison; that Bowne feared Rivenburgh, was under his domination and control, and therefore he cooperated in going to the attic to stand point "for sex." Defendant Rivenburgh contends that the jury in its deliberations, went outside the evidence by taking into consideration the opening statement of Bowne's counsel, claiming it was unsupported by any evidence adduced at the trial.

5. Martinez v. People, 124 Colo. 170, 235 P. 2d 810.

▮ Although the opening statement may have been an exaggeration of Rivenburgh's control of Bowne and Bowne's fear of him, nevertheless Bowne's testimony tended to show that he feared Rivenburgh enough to do whatever Rivenburgh asked or demanded of him. The record also reveals that so much of a derogatory nature was adduced in the testimony as to Rivenburgh that any effect that Bowne's opening statement might have had on the jury would have been insignificant. Rivenburgh's counsel did not object to Bowne's opening statement nor request an instruction for the purpose of curing the supposed error. It is, of course, not error for the court not to give an instruction where it is not asked.[6] This assignment of error is without merit.

Judgment is affirmed and case as to Rivenburgh is remanded to the trial court for execution.

Codefendant Bowne filed a separate appeal and relies on several assignments of error for a reversal distinct from the errors assigned by Rivenburgh. We shall consider the contentions of Bowne in the order in which they are submitted to us in his brief.

▮ Defendant Bowne's first assignment of error challenges the constitutionality of section 77–30–2, U.C.A. (1953), pertaining to peremptory challenges where two or more defendants are tried jointly, in that defendant was denied due process of law,[7] the right to a fair and impartial jury,[8] and the equal protection of the laws [9] under our State and Federal Constitutions.

Utah Code Annotated, Section 77–30–15 (1953), allows the state and the defendant 10 peremptory challenges, if the offense charged is punishable by death. In the event of a joint trial this section is modified by the provisions of U.C.A. section 77–30–2 (1953), the section attacked, which reads as follows:

"If two or more defendants are jointly tried they shall collectively be allowed the number of peremptory challenges specified in section 77–30–15 only in case they join in such collective challenges, but in addition to such challenges each defendant shall be allowed the following number of peremptory challenges which may be separately exercised:

"(a) Two, if the offense charged is punishable by death.

"(b) * * *."

At the trial defendant Bowne's counsel stated to the court that the two defendants could not agree upon the 10 peremptory challenges allowed in section 77–30–15, or

---

6. State v. Peterson, 121 Utah 229, 240 P. 2d 504.

7. Constitution of Utah, Art. I, Section 7.

8. Constitution of Utah, Art. I, Section 12.

9. Constitution of the United States, Amend. XIV.

any of them. Bowne further announced that he would "conditionally" agree to the 10 selections of defendant Rivenburgh and reserve his right to appeal the question to this court. Bowne made no request to the court for a ruling, and received none. Each defendant exercised separately the two additional peremptory challenges provided in subdivision (a) of section 77–30–2. In the case of State v. Nemier,[10] this court held that joint defendants must exercise their peremptory challenges collectively, and if they do so, each defendant may exercise separately the additional challenges provided. This case was in effect followed.

Counsel for Bowne acknowledges the law of the Nemier case but was attempting to lay a foundation for the constitutional question, primarily on the clause of the equal protection of the laws, on the theory that Rivenburgh had 10 and two challenges, whereas his client only had two challenges. Whether this is true or not under Bowne's "conditional" agreement to join in Rivenburgh's peremptory challenges, we shall, nevertheless, consider the problem on this theory.

The constitutional question of section 77–30–2 was not raised in the Nemier case and has never before been presented to this court.

Defendant Bowne does not present a strenuous argument for either his due process of law or impartial jury theories, but does seem to lay great stress upon the matter of equal protection of the laws. In the instant case the due process clause is satisfied if the statute involved affords equal protection of the laws. The same is also true as to his fair and impartial jury theory since defendant made no claim or showing that any biased or unfit juror was sworn to try the case.[11]

We come then to Bowne's main contention that section 77–30–2 violates the equal protection of the laws clause of the Fourteenth Amendment of our Federal Constitution. His argument is to the effect that said section discriminates against any joint defendant who cannot agree with the others in the collective exercise of the peremptory challenges required under section 77–30–2.

The discrimination must be unreasonable or arbitrary to be unconstitutional.[12] In construing a statute, all doubts should be resolved in favor of constitutionality.[13] While the Utah court in State v. Nemier, supra, did not concern itself with the constitutionality of the act, this aspect of the problem has been considered by our sister state of California.

10. State v. Nemier, 106 Utah 307, 148 P. 2d 327.
11. People v. Pilbro et al., 85 Cal.App. 789, 260 P. 303.

12. State v. Mason, 1938, 94 Utah 501, 78 P.2d 920, 117 A.L.R. 330.
13. General Electric Co. v. Thrifty Sales, Inc., 5 Utah 2d 326, 301 P.2d 741.

In the case of Muller v. Hale (Calif.),[14] the court upheld the constitutionality of a statute which stated: "Either party may challenge the jurors; but where there are several parties on either side they must join in a challenge before it can be made." The court said: "The appellant concedes that the ruling of the court was justified by the statute of this state, but contends that it violates the Fourteenth Amendment of the constitution of the United States, in that it denies persons equal protection of the laws. We see nothing in this contention. * * *." It is true that this was a civil case, but where the matter of equal protection of the laws is involved, there is no essential difference between civil and criminal rights. For example, in People v. Philbro (Calif.),[15] a criminal case, the court expressly relied on the holding in the Muller case and held that: "The requirements that defendants or parties must join in the exercise of peremptory challenges is not violative of any constitutional provision."

Section 77–30–2 does not deny the equal protection of the laws, and thus violate the Fourteenth Amendment, for the reason that the same rule applies to all the defendants alike when they, are tried jointly and does not discriminate against any one defendant when the statute is followed as interpreted by the Nemier case. In other words the test of equal protection under the statute in question is not based on its application to a joint defendant who refuses to follow the statute in the collective exercise of his peremptory challenges, as contended by defendant Bowne. Since the statute applies the same to each joint defendant in the exercise of their peremptory challenges collectively, it is not discriminatory, and Bowne was not denied the equal protection of the law. His contentions of unconstitutionality of the statute are without merit.

Defendant Bowne contends that the trial court abused its discretion in denying his motion for a separate trial. The motion was supported by affidavits of counsel for Bowne and two of his associates, and is based on the claims that the defenses of the joint defendants were antagonistic, that discord and difference of opinion existed between counsel for Bowne and counsel for Rivenburgh as to the theory of defense of the two defendants, and that evidence admissible as to defendant Rivenburgh and not as to defendant Bowne would cause confusion to the jury and thereby prejudice defendant Bowne.

When two or more defendants are jointly charged with any offense they shall be tried jointly, unless the court in its discretion orders separate trials.[16] If

14. Muller v. Hale, 138 Cal. 163, 71 P. 81.
15. People v. Pilbro, 85 Cal.App. 789, 260 P. 303, 305.

16. 77–31–6, U.C.A. (1953).

the ruling of the court deprives the defendant of a fair trial, then the judge has abused his discretion. The discretion may not be exercised arbitrarily.

At the time the motion for severance was made and argued the court had before it the affidavits and the state's theory of the case as alleged in the bill of particulars. The oral argument was not reported. The bill of particulars alleged that Bowne "participated in the arranging of the murder and helped hold the victim while the stab wounds were inflicted." In other words, the defendants participated in a joint activity [17] on this Sunday afternoon and evening. We cannot say that the trial judge abused his discretion in the absence of a better showing than the self-serving affidavits in the light of the state's theory of the case. However, we are not precluded in the instant case from looking at the entire record to determine whether or not the court abused its discretion for the reason that Bowne assigns in his motion for new trial, among other matters, prejudicial error [18] occurring during the trial based upon the same grounds. The record reveals, contrary to the claim of Bowne, that the defenses of the joint defendants while different, were not inconsistent or antagonistic. There were no such circumstances in the instant case as in the case of People v.

Braune (Illinois) [19] strongly relied upon by defendant where hostility existed between the codefendants, with each protesting his innocence and condemning the other. As to the difference of opinion existing between counsel as to their respective defenses, the record further reveals that counsel cooperated with each other throughout the trial. Counsel for Bowne cross-examined witnesses as to the effect of the amphetamine drug in furtherance of Rivenburgh's defense, and when Rivenburgh, as a witness on his own behalf, was taken over by Bowne's counsel, he, Rivenburgh, cooperated with Bowne's defense that he was standing point for sex. During the trial the court was careful when requested to admonish and instruct the jury that certain evidence was admissible as to one defendant and not the other. No prejudicial error occurred during the trial by virtue of the fact that Bowne was not granted a separate trial.

When both sides rested their cases defendant Bowne made a motion to dismiss on the grounds the jury could not find beyond a reasonable doubt that this defendant was guilty of murder. Bowne assigns as error the court's ruling in denying the motion. Defendant's contention is without merit and needs but little comment. As

17. 1942, State v. Burke, 102 Utah 249, 129 P.2d 560.
18. 1947, State v. Miller, 111 Utah 255, 177 P.2d 727.

19. People v. Braune, 363 Ill. 551, 2 N.E.2d 839, 104 A.L.R. 1513.

**110**

was said in the case of State v. Penderville (Utah),[20] "* * * It has been repeatedly held by this court that upon a motion to dismiss or to direct a verdict of not guilty for lack of evidence that the trial court does not consider the weight of the evidence or credibility of the witnesses, but determines the naked legal proposition of law, whether there is any substantial evidence of the guilt of the accused, and all reasonable inferences are to be taken in favor of the state * * *. If there is before the court evidence upon which reasonable men might differ as to whether the defendant is or is not guilty, he may deny the motion."

In the case at bar there was adduced by the state competent evidence that Bowne aided and abetted in the murder from which the jury could find beyond a reasonable doubt that the defendant was guilty of the crime with which he was charged.[21] The conflict of evidence[22] as between the state's theory of the case and Bowne's defense of standing point in the attic for sex as a lookout was for the jury to resolve. The record in this case is voluminous, more than one thousand pages of transcript, and it would serve no purpose in piecing together the facts relied upon by the state that would require the court to submit the case to the jury. The trial court

did not err in denying defendant's motion to dismiss.

Defendant Bowne objected to the court's instructions numbered 15 and 26. Instruction No. 15 is the court's instruction on "aiding and abetting." Defendant's objection goes to the first paragraph of the instruction which reads as follows: "You are instructed that all persons concerned in the commission of a *crime*, whether they directly commit the act constituting the offense, or aid and abet in its commission, are principals in *any crime* so committed." (Italics ours.) Because much testimony related to Bowne's defense pertaining to the crime of sodomy, he argues, "that the court told the jury, or at least it was confusing, that if the defendant was concerned in the commission of *a crime* (the crime of sodomy perhaps), then he is a principal in *any crime* so committed (the crime of murder included)." This argument is untenable. Murder was the only offense charged and the testimony relating to Bowne standing point for sodomy was clear as a defensive matter and not confusing. Instruction No. 15 contains several paragraphs and is concrete, not abstract as contended by Bowne. Subsequent paragraphs of the instruction pointed up the crime of murder by aiding and abetting

20. State v. Penderville, 2 Utah 2d 281, 272 P.2d 195, 198.
21. State v. Peterson, 121 Utah 229, 240 P.2d 504.

22. State v. Lewellyn, 71 Utah 331, 266 P. 261, 263, quoting, 16 C.J. 935, "* * or where the evidence of a material nature is conflicting." See also 23 C.J.S. Criminal Law § 1145.

and met the rule which requires the court to apply the law to the facts as supported by the evidence, and not give abstract statements of the law.[23]

The court's Instruction No. 26 as far as material to Bowne's objection reads as follows: "You must arrive at your decision solely from the evidence submitted to you during the trial, and the natural inferences which may be reasonably drawn therefrom, together with the *admissions and stipulations of the parties* during the trial * * *." (Italics ours.) Defendant claims this instruction is erroneous since it fails to restrict the jury to a consideration of the admissions and stipulations of the parties during the trial to the respective party who made the admission or stipulation. There is no merit in this contention. The jury could not have possibly been misled by it even though it may be difficult at times for them to put out of their minds an admission or stipulation, or any testimony for that matter, as to the defendant it does not apply, in a joint trial. During the trial the judge was careful to instruct and admonish the jury that certain evidence admitted as to one defendant was not to apply as to the other, and the court's Instruction No. 11 covered the import of the above oral instruction and admonition. The trial court did not err in giving Instruction No. 26.

Defendant Bowne assigns as error the court's refusal to give his requested Instruction No. 13, which proposed instruction covered his defense to the effect that if defendant Bowne intended to stand point while defendant Rivenburgh and the deceased Verner mutually engaged in an act of sodomy, and did not intend to be a participant in an act of murder, the jury should find defendant Bowne not guilty. While a defendant is entitled to an instruction on his defense, the proposed instruction was not a correct statement of the law in that it omitted to inform the jury that if the facts set forth in the proposed instruction "created a reasonable doubt in the minds of the jury as to defendant's guilt" they would find the defendant not guilty. The instruction as requested incorrectly stated, " * * * if * * * you conclude that it is reasonable to believe * * *." The instruction was also argumentative. The court's Instruction No. 21 protected the rights of defendant Bowne as to his defense by telling them in substance that if the state had failed to prove beyond a reasonable doubt that Bowne intended to participate in the killing, they should find him not guilty. It is, of course, not necessary that his defense be stated in his own words even when the requested instruction is correct, if the applicable law is given the jury by the court.[24]

---

23.  State v. Thompson, 1946, 110 Utah 113, 170 P.2d 153.

24.  State v. Rosenberg, 84 Utah 402, 35 P. 2d 1004.

**112**

The trial court did not err in refusing to give Bowne's Instruction No. 13.

Bowne filed a motion for new trial based upon six grounds, all of which were overruled by the court, and said ruling is now assigned as prejudicial error. We shall consider them in order:

1. The first contention is based on prejudicial error occurring during the trial as a result of Bowne being required to be jointly tried with Rivenburgh, which we discussed and overruled in connection with the trial court's refusal to grant defendant's motion for separate trial.

2. Bowne complains because the jury was separated during its deliberations in that the bailiff took six jurors at a time down an elevator for the purpose of going to the rest room. This was brought to the attention of the court. Dividing the jury into two sections was apparently necessary to give them this means of transportation, and the desired relief. This court held in State v. Jarrett [25] that where separation of jury is for purposes of necessity, under surveillance of bailiff, and there is no communication with any juror, prejudice will not be presumed, and the burden is on the defendant to establish that he was prejudiced by the alleged separation. Defendant Bowne has not established any alleged prejudice whatever as a result of the separation. In the instant case as in State v. Jarrett, supra, no evidence was adduced that anyone conversed with a juror [26] during the deliberation. No prejudice being shown by the defendant, the contention of separation of the jury is not well taken.

3. Bowne complains that after many hours of deliberation, the court instructed the bailiff to inform the jurors that they would be taken to a hotel for the night, at which time the foreman told the bailiff they were deadlocked. Another juror asked for an additional fifteen minutes. The jurors were left to deliberate. It was about 3 a. m. The jurors, 10 minutes later, came in with a verdict of guilty. The above does not appear on the record, neither was it supplied by affidavit, but we shall assume for purpose of argument that it occurred. Bowne urges that the verdict was reached by means other than a fair expression of opinion by all the jurors. This allegation is without proof and can be based on nothing more than counsel's mere suspicion. The circumstances do not even suggest the conclusion urged. The jury reached its unanimous verdicts only after nine hours of deliberation, which would indicate a fair expression of opinion by all the jurors. Courts examine verdicts ob-

25. State v. Jarrett, 1947, 112 Utah 335, 187 P.2d 547.

26. Utah Code Annotated (1953), 77–31–32.

jectively [27] and where, as here, the verdicts are supported by competent sufficient evidence and defendant has failed to prove any misconduct of the jury in reaching its verdict, the motion should be and was properly denied.

4. Jesse Garcia, a codefendant in the crime charged and who was to be tried separately following the case at bar, was called by the prosecution as the state's "next" witness, when on motion of Bowne's counsel the jury was excused from the court room. After argument and still in the absence of the jury, the court had Garcia take the oath and exercise his personal privilege on the grounds of self-incrimination.[28] The only thing that is revealed by the record that occurred before the jury was the calling of Garcia as the state's "next" witness. Undoubtedly he was seen by the jury before they left the court room. Bowne claims the calling of Garcia was misconduct on the part of the prosecutor and prejudicial to the defendant. This claim is primarily based on the statement of Bowne's counsel during argument that he had previously told the prosecutor that Garcia would not testify. On the other hand, the prosecutor claimed that Garcia at some time prior had told him he wanted to testify. In any event, the prosecutor insisted quite strenuously that he had a right to call Garcia to the stand and if he re-fused to testify, exercise his privilege before the jury, since it was personal to him and could not be exercised by his attorney. The prosecutor was legally correct in his contention and therefore the fact that he called Garcia as the state's "next" witness did not constitute misconduct on his part, as contended by counsel for Bowne; and the court handled the matter as discreetly as possible in favor of Bowne in not allowing Garcia to take the stand and exercise his privilege before the jury, as the court might have done, but in the absence of the jury instead, committed no error prejudicial to the defendant, or at all.

5. Bowne complains as to the procedure followed in granting the state two cross-examinations of Rivenburgh when he took the stand as a witness in his own behalf. Rivenburgh was questioned on direct examination by his counsel; he was then cross-examined by the state on matters touched on direct. Upon completion of the state's cross-examination, Rivenburgh was cross-examined by Bowne on matters touched on direct. During Bowne's cross-examination of Rivenburgh, new matter was adduced pertaining to Bowne's defense which virtually made Rivenburgh his witness. Then the state was permitted to cross-examine Rivenburgh again as to matters brought out by Bowne before counsel

27. State v. Moore, 111 Utah 458, 183 P. 2d 973.

28. Constitution of Utah, Art. I, Section 12. Utah Code Ann. (1953) 77–1–10.

for Rivenburgh was permitted to examine his witness again on re-direct. It is the state's second cross-examination of Rivenburgh that counsel for Bowne objected to on the grounds that it prejudiced defendant Bowne by affording the prosecution undue repetition in having two cross-examinations. While there may have been some repetition the procedure of examination of Rivenburgh was orderly and fair. The state was entitled to a second cross-examination of witness Rivenburgh in view of the matters touched on by Bowne in his cross-examination. The presence of two defendants with different defenses complicated the problem somewhat but the court had a discretion [29] in the matter and was careful to give it the most orderly course possible, and the evidence was relevant, material, and competent at the time it was offered. No error was committed.

■ 6. Defendant's last contention on his motion for new trial is based upon the grounds that no motive was shown as far as Bowne was concerned, citing the case of People v. Tom Woo,[30] to the effect that the absence of any proof of motive tends to support the presumption of innocence. While this is true, it is not essential to prove a motive if the crime can otherwise be established beyond a reasonable doubt,

as it was so established in the case at bar; therefore the absence of proof of motive is no grounds for a new trial.

■ The trial court properly overruled defendant's motion for new trial on all the grounds alleged since there were no errors of law [31] committed which were prejudicial to the defendant.

■ Bowne's next assignment of error is based upon the trial court's refusal to require the state to furnish tape recordings and copies of statements taken of the witnesses and defendants during the investigation of the case, as requested in his motion for production of documents. The court limited the scope of production of documents, but, did, in fact, order that a great many of the instruments, writings, photographs, reports, etc., requested by Bowne, be given to him. Also some of the wire recordings were made available for inspection and were heard by both defense counsel even though the recordings were not used in evidence. It is difficult, if not impossible, to determine from the court's minute entry ruling or the briefs, just what was excluded, although the ruling was limited as before stated. However, the contention of Bowne that an unfair and prejudicial advantage was afforded the prosecu-

---

29. 23 C.J.S. Criminal Law § 1045.
30. People v. Tom Woo, 1919, 181 Cal. 315, 184 P. 389. See People v. Isby, 1947, 30 Cal.2d 879, 186 P.2d 405. Slater v. State, 224 Ind. 627, 70 N.E.2d 425.

31. State v. Montgomery, 37 Utah 515, at page 518, 109 P. 815, at page 816.

tion in failing to compel the production of documents as requested in defendant's motion is not supported by any proof and is not made out by the record. We therefore conclude under the circumstances that no error was committed in the court's ruling.

Defendant's last contention is that the court erred in refusing to admit evidence concerning the general character and reputation of the deceased as to his immoral trait. Defendant admits that as a general rule the character and reputation of the deceased is inadmissible as being immaterial, but claims it was proper evidence in the instant case for the purpose of showing that it was reasonable to believe that the decedent was willingly going to the attic to practice sodomy with Rivenburgh, in furtherance of Bowne's defense that he went to the attic to stand point for sodomy and not to aid and abet in a murder. Bowne cites no cases in support of his view that an exception should have been made here. While character evidence as to the particular immoral trait involved was not allowed as to deceased, nevertheless, there was evidence to the effect that he was a pervert, that he had engaged in acts of sodomy, and that just the day before he had been misused by five other inmates. There was no disagreement whatever between the state and Bowne as to the fact that Verner's purpose in going to the attic was to engage in an act of sodomy with Rivenburgh. Therefore, even if the evidence proferred as to decedent's immorality were admissible, it could do nothing more than support the undisputed fact as contended by him. Thus, the trial court's refusal to admit the proferred character evidence could not have constituted prejudicial error in any event.

In conclusion we hold that section 77–30–2, U.C.A.1953, is not violative of the Federal and State Constitutions, that defendant Bowne had a fair trial before an impartial jury; that the trial was conducted without prejudicial error, and that the verdict is supported by sufficient evidence. The judgment is affirmed.

CROCKETT, C. J., and WADE, McDONOUGH, and CALLISTER, JJ., concur.

HENRIOD, J., being disqualified, did not participate herein.