STATE OF HAWAII, Plaintiff-Appellee, v. JAMES E. COTTON, Defendant-Appellant

NO. 5400

DECEMBER 3, 1973

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON AND KOBAYASHI, JJ.

OPINION OF THE COURT BY ABE, J.

The defendant, James E. Cotton, was charged with and convicted of, operating a motorcycle without goggles or face shield in violation of HRS § 286-81 (1) (B).[1] He appealed from the judgment and sentence entered. The defendant attacks the constitutionality of the statute under which he was convicted on several grounds.

## I. EQUAL PROTECTION

The defendant first attacks the constitutionality of HRS § 286-81 (1) (B) by contending that requiring motorcyclists to wear goggles under threat of criminal sanction, but not requiring the same of operators of automobiles, results in arbitrary and capricious discrimination and violates the equal protection guaranty of the United States and Hawaii State Constitutions. We do not agree.

"The general principle stated by the courts in the interpretation of the equal protection clause is that all persons shall be treated alike under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed." *State v. Johnston,* 51 Haw. 195, 202, 456

---

[1] HRS § 286-81 (1) provides in pertinent part:

§ 286-81 Motorcycle, motor scooter, etc.; protective devices. No person shall:

(1) Operate a motorcycle or motor scooter on any highway in the State unless he and any passenger he carries on the motorcycle or motor scooter wears (A) a safety helmet securely fastened with a chin strap; (B) safety glasses, goggles, or a face shield, in the case of a motorcycle or motor scooter that is not equipped with windscreens or windshields; . . . .

P.2d 805, 809 (1969), *appeal dismissed,* 397 U.S. 336 (1970). "The guarantee . . . of the equal protection of the laws is not a guarantee of equality of operation or application of state legislation upon all citizens of a State." *Stebbins v. Riley,* 268 U.S. 137, 142 (1925). "Thus, what is prohibited by the equal protection guaranty is class legislation, discriminating against some and favoring others. The guaranty was not intended to take from the states the right and power to classify the subjects of legislation, provided such classification of persons and things is reasonable for the purpose of legislation." *State v. Johnston,* 51 Haw. at 203, 456 P.2d at 810 (1969), *appeal dismissed,* 397 U.S. 336 (1970).

The classification attacked here is for regulatory purposes, and the burden is upon the defendant to show that it is arbitrary and capricious and that it bears no reasonable relation to the object of legislation. The general law is that regulatory classifications are presumed valid and constitutional, and are to be upheld unless no reasonable state of facts is conceivable to support them. *Day-Brite Lighting, Inc. v. Missouri,* 342 U.S. 421 (1952); *McGowan v. Maryland,* 366 U.S. 420 (1961); *Williamson v. Lee Optical Co.,* 348 U.S. 483 (1955).

Under the record of this case, the sole basis for the equal protection argument is that motorcyclists and operators of automobiles are treated differently. We recognize that, as the U.S. Supreme Court said in *Williamson v. Lee Optical Co., supra* at 489:

> The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and propor- tions, requiring different remedies. Or so the legislature may think. *Tigner v. Texas,* 310 U.S. 141. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. *Semler v. Dental Examiners,* 294 U.S. 608. The legislature may select one phase of one field and apply a remedy there, neglecting the others. *A.F. of L. v. Ameri- can Sash Co.,* 335 U.S. 538. The prohibition of the Equal Protection Clause goes no further than the invidious dis-

 

crimination. We cannot say that that point has been reached here.

We find no difficulty in discerning a reasonable basis for difference in the legislative treatment accorded motorcyclists, on the one hand, and operators of automobiles, on the other. The physical characteristics of automobiles and motorcycles are evidently different, as are the skills for, and conditions, of operating these vehicles. These differences have repeatedly been held to be a reasonable basis for legislative classification.[2] Thus, we hold that the statute in question does not violate the right to equal protection of the laws guaranteed by the United States or Hawaii State Constitutions.

## II. DUE PROCESS

The defendant next attacks the constitutionality of HRS § 286-81 (1) (B) on the ground that wearing of goggles would jeopardize his life in violation of the due process of law guaranty. He cites various reports and studies in an attempt to show the lack of wisdom demonstrated by the legislature in its enactment of this statutory provision.

We cannot agree with the defendant that the legislature showed lack of good judgment in enacting the law. However, even if we did, we believe that enactment of laws is the prerogative of the legislature and it is not for the judiciary to second-guess the legislature or substitute its judgment for that of the legislature.

The due process of law guaranty does not give this court or any court the authority to substitute judges' opinions for legislators' opinions as to the wisdom of any law enacted. As stated by Justice Frankfurter, in his concurring opinion in *A.F. of L. v. American Sash Co.*, 335 U.S. 538, at 556-57 (1949):

---

[2] Courts of other jurisdictions have considered similar statutes and rejected arguments that the classification here complained of violated the equal protection guarantee. *The People v. Fries*, 42 Ill.2d 446, 448, 250 N.E.2d 149, 150 (1969); *Simon v. Sargent*, 346 F. Supp. 277, 279 (D. Mass., 1972), *aff'd mem.* 409 U.S. 1020 (1972); *Everhardt v. City of New Orleans*, 253 La. 285, 294, 217 So.2d 400, 403 (1968), *appeal dismissed*, 395 U.S. 212 (1969).

As history amply proves, the judiciary is prone to misconceive the public good by confounding private notions with constitutional requirements, and such misconceptions are not subject to legitimate displacement by the will of the people except at too slow a pace. [Fn. omitted.] Judges appointed for life whose decisions run counter to prevailing opinion cannot be voted out of office and supplanted by men of views more consonant with it. They are even farther removed from democratic pressures by the fact that their deliberations are in secret and remain beyond disclosure either by periodic reports or by such a modern device for securing responsibility to the electorate as the "press conference." But a democracy need not rely on the courts to save it from its own unwisdom. If it is alert — and without alertness by the people there can be no enduring democracy — unwise or unfair legislation can readily be removed from the statute books. It is by such vigilance over its representatives that democracy proves itself.

Our right to pass on the validity of legislation is now too much part of our constitutional system to be brought into question. But the implications of that right and the conditions for its exercise must constantly be kept in mind and vigorously observed. Because the Court is without power to shape measures for dealing with the problems of society but has merely the power of negation over measures shaped by others, the indispensable judicial requisite is intellectual humility, and such humility presupposes complete disinterestedness. And so, in the end, it is right that the Court should be indifferent to public temper and popular wishes. Mr. Dooley's "th' Supreme Coort follows th' iliction returns" expressed the wit of cynicism, not the demand of principle. A court which yields to the popular will thereby licenses itself to practice despotism, for there can be no assurance that it will not on another occasion indulge its own will. Courts can fulfill their responsibility in a democratic society only to the extent that they succeed in shaping their judgments by rational standards, and

rational standards are both impersonal and communicable. Matters of policy, however, are by definition matters which demand the resolution of conflicts of value, and the elements of conflicting values are largely imponderable. Assessment of their competing worth involves differences of feeling; it is also an exercise in prophecy. Obviously the proper forum for mediating a clash of feelings and rendering a prophetic judgment is the body chosen for those purposes by the people. Its functions can be assumed by this Court only in disregard of the historic limits of the Constitution.

Also, as stated by the U.S. Supreme Court in *Nebbia v. New York,* 291 U.S. 502, 537-38 (1934):

With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power. [Fn. omitted.]

*See also West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 398-400 (1937).

Today the due process doctrine is concerned chiefly with procedural fairness. The due process issue raised by the defendant here has nothing to do with procedure. We cannot say that the statute violates "substantive" due process even though the defendant contends that wearing of goggles does not lessen the number or severity of motorcycle injuries, citing various research projects and other reports. The State points to other studies and reports, as well as to those very reports referred to by the defendant to argue otherwise. At the least, we believe that whether use of goggles would prevent injuries, or lessen the severity of injuries suffered, is debatable. We believe that the legislature could have reasonably determined that the use of goggles would

154

accomplish the results intended. Thus, under the record of the case, it cannot be said that the statute is arbitrary and capricious. We therefore hold that the statute does not violate the due process guaranty.

### III. POLICE POWER — GOGGLES

The defendant next claims that requiring motorcyclists to wear safety glasses or goggles is not a reasonable exercise of the police power by the State. On the other hand, the State contends that it has substantial interest in highway safety. We agree with the State's contention, because it is clear that the legislature has the power to control and regulate the use of our highways. This power necessarily includes the right to enact safety requirements.

Contrary to the defendant's contention that the requirement for the wearing of goggles has no "redeeming benefit to society" that would justify the enactment of HRS § 286-81 (1) (B) under the State's police power, we believe that the requirement is a reasonable exercise of the police power. We see a distinct possibility that wind-blown objects, such as dust, rain, flying insects, etc., could strike the eyes of a motorcyclist and cause him to lose control of his motorcycle, and thereby endanger the safety of *other users* of highways. We believe that the purpose or object of the safety requirement is crystal clear and that it is to insure that a motorcyclist's vision will not be impaired to the extent that the safety of other users of our highways could be jeopardized. We agree with the defendant that the requirement to a certain extent stifles fundamental personal liberties; however, we cannot see how the legislature could have achieved the objective more narrowly than by the requirement imposed by the statute. The U.S. Supreme Court in *Goldblatt v. Hempstead*, 369 U.S. 590, 594 (1962) said:

> The term "police power" connotes the time-tested conceptional limit of public encroachment upon private interests. Except for the substitution of the familiar standard of "reasonableness," this Court has generally

refrained from announcing any specific criteria. The classic statement of the rule in *Lawton v. Steele*, 152 U.S. 133, 137 (1894), is still valid today:

"To justify the State in . . . interposing its authority in behalf of the public, it must appear, first, that the interests of the public . . . require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals."

Also in *Shelton v. Tucker*, 364 U.S. 479, 488 (1960), the Court said:

In a series of decisions this Court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.

We believe that the provision in question meets the standards established by the United States Supreme Court. Therefore, we hold that the requirement imposed is a reasonable exercise of the State's power to promote public safety on its highways, a legitimate governmental objective, and therefore the statute is constitutional.

Affirmed.

*James E. Cotton,* defendant-appellant, pro se.

*Stephen Y. Lau,* Deputy Prosecuting Attorney *(Barry Chung,* Prosecuting Attorney, City & County of Honolulu, of counsel) for plaintiff-appellee.