STATE of Utah, Plaintiff and Respondent,

v.

Dale S. PIERRE, Defendant and Appellant.

No. 13903.

Supreme Court of Utah.

Nov. 25, 1977.

1340

D. Gilbert Athay, Robert Van Sciver and Randall Todd Gaither, of Athay, Bown & Van Sciver, Salt Lake City, for defendant and appellant.

Robert B. Hansen, Atty. Gen., Earl F. Dorius, Robert R. Wallace, Asst. Attys. Gen., Salt Lake City, for plaintiff and respondent.

WILKINS, Justice:

The Defendant Dale S. Pierre was charged with three counts of murder in the first degree (a capital offense) in violation of Utah Code Annotated, 1953, Section 76–5–202, as enacted 1973,[1] for the murders of Carol Naisbitt, Michelle Ansley, and Stanley Walker; additionally he was charged

---

1. This section, applicable to defendant, though amended in 1975 and 1977, stated: "(1) Criminal homicide constitutes murder in the first degree if under circumstances not constituting manslaughter, the actor intentionally or knowingly causes the death of another under any of the following circumstances:

(a) The homicide was committed by a convict under sentence of imprisonment.

(b) At the time the homicide was committed the actor also committed another homicide.

(c) The actor knowingly created a great risk of death to a person other than the victim and the actor.

(d) The homicide was committed while the actor was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, robbery, rape, forcible sodomy, or aggravated sexual assault or arson, burglary, or kidnapping.

(e) The homicide was committed for the purpose of avoiding or preventing an arrest by a peace officer acting under color of legal authority or for the purpose of effecting an escape from lawful custody.

(f) The homicide was committed for pecuniary or other personal gain.

(g) After having previously been convicted of first or second degree murder.

(h) The homicide was committed upon a child under the age of twelve years as the result of physical abuse or neglect . . .

(2) Murder in the first degree is a capital offense."

with two counts of aggravated robbery in violation of Utah Code Annotated, 1953, Section 76–6–302, as enacted 1973,[2] for the robbery of Orren W. Walker, Jr. and Stanley Walker. The acts forming the bases of these crimes occurred at the Hi-Fi Shop, a business selling stereo and allied equipment, located in Ogden, Weber County, Utah, on April 22, 1974 during the robbery thereof. All statutory references herein refer to Utah Code Annotated, 1953, as enacted in 1973, Title 76, Utah Criminal Code unless otherwise indicated.

The defendant was tried jointly with William Andrews and Keith Roberts (who were charged with the same five counts as defendant and who are the subjects of companion cases decided this date) before a jury in the District Court of Davis County, State of Utah, and the defendant was found guilty on all five counts on November 15, 1974 (the trial having commenced on October 15, 1974). On November 20, 1974, after a hearing to determine sentences on the murder convictions,[3] this same jury returned a unanimous verdict of the death penalty against the defendant on each of the murder counts. The District Judge then on November 27, 1974, sentenced the defendant to death by shooting at the Utah State Prison on all counts of first degree murder, and he also sentenced the defendant to an indeterminate term of five years to life at said prison on the two counts of aggravated robbery.[4]

The evidence at the guilt or innocence stage of the trial (herein "guilt phase")

established that the defendant, Andrews, and Roberts were airmen stationed at Hill Air Force Base, Utah. Stanley Walker, Michelle Ansley, Carol Naisbitt, Cortney Naisbitt (son of Carol Naisbitt), and Orren W. Walker, Jr. (father of Stanley Walker) were tied up, made to lie on the floor, and forced to drink liquid Drano on the evening of April 22, 1974, in the basement of the Hi-Fi Shop in Ogden, Utah, by the defendant in company with Andrews, who aided the defendant by pouring the caustic substance into a plastic cup for accomplishment of these violent acts. The defendant and Andrews both had hand guns and defendant finally shot all of the victims in the head with either a .25 caliber or .38 caliber handgun, which caused the deaths, within a brief period of time during that April evening, of Stanley Walker, Michelle Ansley (who had also been raped by the defendant just before he shot her) and Carol Naisbitt. Cortney Naisbitt and Orren W. Walker, Jr. survived but obviously sustained injuries, with Cortney suffering particularly serious ones.

Evidence further established that Orren and Stanley Walker were robbed in an aggravated manner of personal property in their possession (equipment from the Hi-Fi Shop being taken from Stanley and a watch and wallet being taken from Orren) on April 22nd at the Hi-Fi Shop by the defendant, Andrews, and Roberts. The defendant and Andrews were identified inside of said shop during the robbery and Roberts was identified walking in front of it.

2. This section, applicable to defendant, though amended in 1975, stated: "(1) A person commits aggravated robbery if in the course of committing robbery, he:

 (a) Uses a deadly weapon; or

 (b) Causes serious bodily injury upon another.

 (2) Aggravated robbery is a felony of the first degree.

 (3) For the purposes of this part, an act shall be deemed to be 'in the course of committing a robbery' if it occurs in an attempt to commit, during the commission of, or in the immediate flight after the attempt or commission of a robbery."

 Additionally Section 76–6–301 defines robbery as: "(1) Robbery is the unlawful and in-

tentional taking of personal property in the possession of another from his person, or immediate presence, against his will, accomplished by means of force or fear.

 (2) Robbery is a felony of the second degree."

3. Utah's Criminal Code provides in capital cases for a penalty or sentencing hearing by the jury (or court if the jury hearing is waived) after the guilt phase of the trial. See specifically Secs. 76–3–206 and 76–3–207.

4. See Secs. in note 3 and Secs. 76–3–203, 76–3–208, and Utah Code Ann., 1953, 77–36–17.

The evidence at this stage of the proceedings was extensive, there being thereat sixty-six witnesses and more than 300 exhibits of physical evidence. In addition to matters mentioned above, the evidence, in summary, established that Andrews had purchased a blue 1970 Chevrolet van in November, 1973, which was used in the robbery of the Hi-Fi Shop on the evening in question; that Andrews had stated in February, 1974, that he would like to rob a hi-fi shop and would kill anyone who got in his way; the defendant saw in April, 1974 the movie "Magnum Force" in which someone was murdered by being forced to drink Drano; defendant and Andrews priced stereo items at the Hi-Fi Shop two days before the fatal day of April 22nd; defendant rented a storage unit on April 22, 1974, signing a lease agreement thereon which agreement was discovered in defendant's room after the crimes; the storage unit contained a bottle labeled "Drano" and a plastic cup as well as a large quantity of stereo equipment taken from the Hi-Fi Shop, and fingerprints of defendant and Andrews were on some of this equipment; in the afternoon of April 22nd, defendant and Andrews were identified in the blue Chevrolet van as it was at or near the Hi-Fi Shop and Roberts was driving said vehicle near the shop; wallets, purses, and other personal items of identification belonging to the victims were found next to defendant's barracks as well as Hi-Fi Shop labels in Andrews' room and in a garbage can in the latrine of defendant's barracks; and the .25 caliber pistol used to shoot some of the victims was owned by a roommate of Roberts, who had borrowed it from this roommate shortly before April 22nd.

Orren W. Walker, Jr., an eye witness victim to events inside the Hi-Fi Shop on that April 22nd also testified that Michelle, Cortney, and Stanley pled for their lives before the defendant and Andrews; and after shooting him (Orren), the defendant vehemently kicked a ball point pen into one of his ears and attempted to strangle him with a cord.[5]

At the penalty or sentencing phase of the trial (herein "penalty phase") which took place before the same jury as heard and participated in the guilt phase, the defendant and Andrews were parties thereto but Roberts was not as he had not been convicted of a capital offense. Defendant did not give testimony at this latter phase though Andrews did.

The State presented as witnesses a psychiatrist, a clinical psychologist and a United States Air Force Lieutenant; and defendant called a Protestant Chaplain and a criminologist as witnesses.

Evidence about defendant adduced at this phase demonstrated that while in the Air Force, he failed to report to places of duty, wrote two bad checks (for nominal amounts), and unlawfully took another's auto. Also, defendant's Commander initiated a separation action from the Air Force against him which was not consummated, on the basis that Pierre was "minimal productive, and a limited potential airman," though that same Commander recommended honorable discharge for him.

Further evidence showed that the defendant did not suffer from extreme mental or emotional disturbance, and the clinical psychologist testified that he believed capital punishment had a deterrent effect.

The witnesses for the defendant presented evidence about the propriety, history and effects of capital punishment,[6] and they generally testified adversely concerning the imposition of the death penalty.

5. The record movingly establishes a heroic discipline by Orren Walker who, feigning death after the shooting, endured enormous physical and mental torment in silence and immobility. By doing so he was able to survive and relate the events that unfolded in horror before him.

6. One of the witnesses, a Dr. Gerald Smith, testified that since statehood (1896), 140 persons have been convicted of first degree murder in Utah, of whom 31 were executed by the State (29 by shooting and 2 by hanging).

Defendant urges error in that Sections 76–3–206 [7] and 76–3–207, at note no. 11 infra, do not meet the constitutional requirements established in landmark cases decided by the United States Supreme Court.[8]

*Furman* did not hold that capital punishment per se violates the constitutional law on cruel and unusual punishment, but did mandate, as a minimum requirement by a majority of the Court, that:

> [T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed. At 408 U.S. 310, 92 S.Ct. 2763.

Mr. Justice Stewart in *Gregg* stated:

> *Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action. At 428 U.S. 189, 96 S.Ct. 2932.

He further wrote therein:

> We hold that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it. At 428 U.S. 187, 96 S.Ct. 2932.

Utah's death penalty statutes, just noted, provide for a bifurcated proceeding, consisting of a guilt phase and a penalty phase heretofore mentioned. At the penalty phase, aggravating and mitigating circumstances authorized, respectively, by Sections 76–5–202 (see note no. 1 supra) and 76–3–207 (see note no. 11 infra) are weighed by the jury. We believe under these procedures our statutes are not constitutionally vulnerable.

But defendant believes the failure of Utah's statutes under which he was tried to provide for automatic appellate review (though Section 76–3–206(2), at note no. 7 supra, presently provides for it) rendered them constitutionally infirm. We disagree.

Article I, Section 12, Constitution of Utah and Utah Code Annotated, Section 77–1–8, 1953, extend to a defendant the right of appeal in all cases. And, when an appeal is taken, as in this matter, Section 76–3–207(3), at note no. 11 infra, and *State v. Stenback,* 78 Utah 350, 2 P.2d 1050 (1931) [9] provide for a comprehensive review of the entire case, including a review of a sentence of death to determine if that sentence resulted from prejudice or arbitrary action or was disproportionate to the penalty. Thus we believe that our review function ". . . substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury," *Gregg* at 428 U.S. 206, 96 S.Ct. 2940, and

---

**7.** This section provides: "(1) A person who has been convicted of a capital felony shall be sentenced in accordance with Section 76–3–207, and sentence shall be death or life imprisonment as the court or jury, in accordance with this section, shall determine.

(2) The judgment of conviction and sentence of death shall be subject to automatic review by the Utah State Supreme Court within 60 days after certification by the sentencing court of the entire record unless time is extended an additional period not to exceed 30 days by the Utah State Supreme Court for good cause shown. Such review by the Utah State Supreme Court shall have priority over all other cases and shall be heard in accordance with rules promulgated by the Utah State Supreme Court."

This section was amended in 1977 by adding subsection (2).

**8.** *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Gregg v. Georgia,* 428 U.S. 152, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) and *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

**9.** This Court said in Stenback: ". . . this court, in a capital case . . . may and should sua sponte consider manifest and prejudicial errors which are neither assigned or argued."

"affords additional assurance that the concerns that prompted our decision in *Furman* are not present to any significant degree" in this case. *Gregg,* at 428 U.S. 207, 96 S.Ct. 2941.

■ Further, we do not believe that the absence of an automatic and mandatory review of death cases and penalties in the Utah statutes at the time defendant was charged, tried, sentenced, and appealed provides a ripened basis for a claim of prejudicial error. Because of his *right* to appeal, which he exercised, all procedures of review have been afforded to him which he would have had under a statute compelling automatic review.

■ Defendant also claims that the Utah death penalty provisions are unconstitutional under the Fourteenth Amendment of the Constitution of the United States in that the death penalty does not serve a compelling state interest which could not be fulfilled by less drastic means.

Mr. Justice Stewart said in *Gregg* :

Therefore, in assessing a punishment selected by a democratically elected legislature against the constitutional measure we presume its validity. We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people. At 428 U.S. 175, 96 S.Ct. 2926.

And he continues therein by saying:

In part, capital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs. At 428 U.S. 183, 96 S.Ct. 2930.

Whatever our individual or personal views may be concerning the humanity or wisdom of capital punishment, we cannot support legally this contention by the defendant under the authorities of this State or the pronouncements by the United States Supreme Court.

Defendant contends that the failure of the District Court to apply the standard of proof beyond a reasonable doubt in the defendant's penalty phase violated the Due Process Clause of the Utah and United States Constitutions.[10] Specifically he contends that the State had the burden to prove beyond a reasonable doubt the absence of any mitigating factor which the defendant raises in this phase, and he cites *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) as controlling.

In *Mullaney,* a Maine statute was under attack as it imposed an affirmative burden on the defendant to show that he acted in the heat of passion on sudden provocation in any case in which felonious homicide was charged. Such a statute allowed the State to charge and prosecute any felonious homicide as murder with its consequent harsh penalty regardless of extenuating circumstances. The defendant then had the burden of proving the lesser elements of manslaughter if he wanted the lesser penalty. The Supreme Court of the United States in striking down this statute held that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case.

In Utah, Section 76–3–207, provides for a hearing in the penalty phase to determine whether the sentence for a capital offense will be death or life imprisonment.[11]

10. Article I, Section 7 Utah Constitution; Fourteenth Amendment, U. S. Constitution.

11. This section states:

"(1) When a defendant has been found guilty of a capital felony, there shall be further proceedings before the court or jury on the issue of penalty. The proceedings shall be conduct-

■ *Mullaney* is not applicable in this matter as the Maine statute shifted the proof as just discussed to the defendant in a trial where guilt or innocence was determined. *Mullaney* does not reach nor control matters in the penalty phase. And neither *Gregg, Proffitt,* nor *Jurek,* at note no. 8 supra, require the state to prove absence of mitigating factors beyond a reasonable doubt in this phase. One rationale for not requiring this burden of proof would be the impossibility of the prosecution's sustaining it with respect to some mitigating factors such as the youth of the defendant—if indeed he were a youth.

The substantial thrust of defendant's concern about standard of proof relates to his contention that the State must be required to prove beyond a reasonable doubt the absence of any mitigating factor which he

raised in the penalty phase, and that matter has, of course, just been discussed.

Implicit in that matter, however, is the allegation of error that the Utah Statute, Sec. 76–3–207(2), at note no. 11 supra, does not establish a sufficiently high burden on the State in those instances where the penalty of death is imposed, as in his case, to pass constitutional muster, nor, he contends, did the District Court's instruction require that sufficiently high burden. That instruction stated that ". . . the burden of proof to satisfy the jury that a death sentence is appropriate is on the State."

■ We hold that in the *penalty* phase of capital offenses the burden of proof necessary for a verdict of death over life imprisonment is on the State and that the totality of evidence of aggravating circum-

ed before the court or jury which found the defendant guilty, provided the defendant may waive hearing before the jury, in which event the hearing shall be before the court. In these proceedings, evidence may be presented as to any matter the court deems relevant to sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty. Any evidence the court deems to have probative force may be received regardless of its admissibility under the exclusionary rules of evidence. The state's attorney and the defendant shall be permitted to present argument for or against sentence of death. Aggravating circumstances shall include those as outlined in 76–5–202. Mitigating circumstances shall include the following:

(a) The defendant has no significant history of prior criminal activity;

(b) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;

(c) The defendant acted under extreme duress or under the substantial domination of another person;

(d) At the time of the murder, the capacity of the defendant to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirement of law was substantially impaired as a result of mental disease, intoxication, or influence of drugs;

(e) The youth of the defendant at the time of the crime;

(f) The defendant was an accomplice in the murder committed by another person and his participation was relatively minor;

(g) And any other fact in mitigation of the penalty.

(2) The court or jury, as the case may be, shall retire to consider the penalty. In all proceedings before a jury, under this section, it shall be instructed as to the punishment to be imposed upon a unanimous verdict for death and that to be imposed if a unanimous verdict for death is not found. If the jury reports unanimous agreement to impose the sentence of death, the court shall discharge the jury and impose the sentence of death. If the jury is unable to reach a unanimous verdict imposing the sentence of death, the court shall discharge the jury and impose the sentence of life imprisonment.

(3) Upon any appeal by the defendant where the sentence is of death, the supreme court, if it finds prejudicial error in the sentencing proceeding only, may set aside the sentence of death and remand the case to the trial court, in which event the trial court shall impose the sentence of life imprisonment.

(4) In the event the death penalty in a capital felony is held to be unconstitutional by the Utah supreme court or the United States supreme court, the court having jurisdiction over a person previously sentenced to death for a capital felony shall cause such person to be brought before the court, and the court shall sentence the person to life imprisonment, and any person who is thereafter convicted of a capital felony shall be sentenced to life imprisonment."

stances must therefore outweigh the totality of mitigating circumstances. We believe the District Court's instruction thereon satisfied that requirement in this case. And in our appellate review of this matter we conclude that the aggravating circumstances were overwhelmingly present against the defendant and the mitigating circumstances favoring him most minimal—even from the point of view of inference.

It is significant in this matter that the defendant was charged in the criminal information with the crimes of first degree murder concerning acts specifically covered by subsections (1)(b), (c), (d) and (f) of Section 76–5–202, at note no. 1 supra, and that the jury in the guilt phase found him guilty beyond a reasonable doubt of those crimes; and in the penalty phase the jury was instructed that it could consider as aggravating circumstances—inter alia—those very matters enumerated in the subsections just cited.

Florida, as noted in *Proffitt*, supra, requires in Fla.Stat.Ann., Section 921.141 (Supp.1976–77) written findings by trial judge:

> . . . upon which the sentence of death is based as to the facts: (a) That sufficient aggravating circumstances exist as enumerated in subsection (6), and (b) That there are insufficient mitigating circumstances, as enumerated in subsection (7), to *outweigh* the aggravating circumstances. [Emphasis added.]

Georgia and Texas [12] require, in matters where death is mandated, written findings of proof beyond a reasonable doubt of aggravating circumstances but do not require that aggravating factors outweigh mitigating ones.

In Utah, the burden being on the State to convince the jury that the death penalty is appropriate by proof of total aggravation outweighing total mitigation, though written findings are not required, the basic concern mentioned by Mr. Justice Stewart in *Gregg*, at 428 U.S. 189, 96 S.Ct. 2932, "to minimize the risk of wholly arbitrary and capricious action" is more fully satisfied with respect to a standard of proof, we submit, than those standards approved in *Gregg* and *Jurek*; and particularly when the standard of proof beyond a reasonable doubt obtains in the guilt phase in Utah to find the crime of murder of which aggravating circumstances are a part.

Defendant also claims error below on the ground that inherently prejudicial pre-trial publicity violated his constitutional right to a fair trial, and he specifically contends that the District Court's refusal to grant his request for a change of venue, trial continuance, and motion to sequester the jury violated that right.

It is well established that due process requirements of the Constitutions of Utah and the United States [13] guarantee that an accused receive a trial before a fair and impartial jury free from outside influences.[14] The law concerning inherently prejudicial publicity, which defendant basically urges upon us as pertinent, was largely developed in the 1960's by the United States Supreme Court in these three major decisions.[15]

The decision on which defendant mainly relies is *Sheppard*, which asserts that ". . . where there is a reasonable likelihood that prejudicial news prior to trial

---

**12.** See Ga.Code Ann., 27–2534.1 (Supp.1975); and Texas Code Crim.Proc., Art. 37.071 (Supp. 1975–76).

**13.** Art. I, Sec. 7, Constitution of Utah; Fifth and Fourteenth Amendments, Constitution of the United States.

**14.** *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663

(1963); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965).

**15.** Id. But see *Sinclair v. Turner*, 20 Utah 2d 126, 434 P.2d 305 (1967) where this Court rejected the claim of prejudicial publicity, and cert. denied, 391 U.S. 924, 88 S.Ct. 1822, 20 L.Ed.2d 663.

will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity. In addition, sequestration of the jury was something the judge should have raised sua sponte with counsel." At 384 U.S. 363, 86 S.Ct. 1522. Defendant contends that the District Court's failure to take these steps as requested by defendant violated his right to a fair trial due to the inherently prejudicial nature of the pre-trial publicity. Although the District Court granted the State's motion for change of venue from Weber County to nearby Davis County, the defendant claims he could escape the inherently prejudicial publicity only by moving the trial to Salt Lake County. In addition, despite the fact that the District Court thought a period of six months between the crime and beginning of the trial in District Court was sufficient to minimize any possible adverse effects the pre-trial publicity might have caused, the defendant claims a continuance of the trial for another six months was needed to abate these effects. Also, defendant claims jury sequestration was necessary to prevent the jury's prolonged exposure to the inherently prejudicial pre-trial publicity.

■ Although the trial courts are invested with discretion in the area of granting motions for a change of venue, trial continuance, and jury sequestration, as a general proposition, it is mandated by *Sheppard*, as just quoted, for a trial judge to take appropriate measures when necessary.

■ Under the facts present in the instant case, however, the procedures requested by defendant and required in *Sheppard* are inapplicable. While we do not suggest that *Sheppard* should be strictly confined to its facts it is important to note that the facts of that case disclose some of the most abusive and prejudicial news coverage of a criminal trial in modern judicial history. The press ran editorials declaring, in effect, the defendant's guilt; published cartoons

suggesting defendant's guilt; and created in their barrage of comments and editorials a general community prejudice so strong that when the names of the prospective jurors became known they were subjected to anonymous telephone calls and letters. The publicity was severely aggravated in its prejudicial effect, according to the Court, by the trial court's allowing the press free rein of the courtroom which assumed a "circus-like" atmosphere, with press, television, and radio reporters intruding into every aspect of the trial so as to disrupt "that judicial serenity and calm to which [a defendant is] entitled." *Estes*, at 381 U.S. 536, 85 S.Ct. 1629.

We have none of that in this case. Defendant nowhere asserts that the news reports were biased, that the prosecution leaked items to the press, that there were editorial comments demanding conviction to assuage public outrage, or that defendant was otherwise the subject of a trial by the news media. Moreover, there were not the abuses committed by state officers and officials which so characterize *Sheppard, Estes* and *Rideau*, all supra. In short, this is not one of those exceptional cases where pre-trial publicity exacerbated by State complicity encouraged the jurors to form such strong preconceived views of the defendant's guilt as to be considered inherently prejudicial against him.

■ We believe defendant really contends that he could not receive a fair trial because the press had covered extensively the facts relative to the perpetration of the crimes of which he was convicted. The cases concerning inherently prejudicial pretrial publicity do not stand for the proposition that news prominence alone presumptively deprives one of due process in a trial setting. Concerning *Rideau, Estes* and *Sheppard*, the Supreme Court in *Murphy v. Florida*, 421 U.S. 794 at 799, 95 S.Ct. 2031, at 2036, 44 L.Ed.2d 589, said that these cases ". . . cannot be made to stand for the proposition that juror exposure to information about . . . . news accounts

of the crime with which he is charged alone presumptively deprives the defendant of due process." Rather these cases must be resolved taking the totality of circumstances into account. The Court further stated in *Nebraska Press Association v. Stuart*, 427 U.S. 539 at 554, 96 S.Ct. 2791, at 2800, 49 L.Ed.2d 683 (1976) concerning this same line of precedent that "Taken together these cases demonstrate that pre-trial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial."

Although defendant did not contend actual prejudice, an independent review by this Court of the record in this matter does not reveal sufficient evidence that the pre-trial publicity prevented a fair trial or so infected the minds of the jurors as to leave them biased against the defendant. The voir dire itself was neither simple nor perfunctory. There was a serious and comprehensive examination of the potential jurors to determine if any could remember or had contact, directly or indirectly, with the facts or publicity surrounding the case that would in any way suggest a likelihood of prejudice. Not only did the District Court itself thoroughly question each prospective juror, in camera, but permitted each of the defense attorneys and the state prosecutor to similarly question them. The District Court examined 82 prospective jurors, and 15 were disqualified because of admitted prejudice. The defendant contends that this percentage of disqualification is sufficient to question the reliability of the remaining potential 67 jurors. In *Murphy*, the Court said:

> In a community where *most* veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may

unwittingly have been influenced by it. . . . In the present case . . . 20 of the 78 persons questioned were excused because they indicated an opinion as to petitioner's guilt. [Emphasis added.] At 421 U.S. 803, 95 S.Ct. 2037. *Murphy* cannot be cited as authority for defendant's contention. It rather vitiates it and we therefore reject this contention, as did the Court in *Murphy*.

We believe that an impartial jury was selected and that the District Court acted within its sound discretion in denying the motions concerning change of venue, trial continuance and sequestration.

Defendant additionally cites as error the District Court's failure to grant his motion for a separate trial because inconsistent and antagonistic defenses existed between him, Andrews, and Roberts.

 As a general rule joinder of defendants is the procedure employed when ". . . it appears that persons were jointly involved in the commission of a crime so that the evidence against one is largely applicable to the other ." [16] The matter of granting or denying a motion for severance is a discretionary function of the trial judge,[17] who must weigh prejudice to the defendant caused by joinder against considerations of economy and expedition in judicial administration. Because of the discretion vested in the trial court, considerable latitude should be given to his discretion, and a conviction will be reversed only if refusal by the trial judge to sever is a clear abuse of discretion in that it sacrifices the defendant's right to a fundamentally fair trial.[18]

 After examination of the record we do not think the District Court abused its discretion in denying to the defendant a separate trial. The charges against the de-

---

16. *State v. Pass*, 30 Utah 2d 197, 200, 515 P.2d 612, 614 (1973). Also see U.C.A., Sec. 77–31–6, 1953.

17. Id.

18. *State v. Rivenburgh*, 11 Utah 2d 95, 355 P.2d 689 (1960); *State v. Pass*, supra.

fendant, Andrews, and Roberts resulted from their participation in the same or some of the same series of criminal acts or transactions. A substantial part of the evidence and testimony offered by the State was relevant to all three participants. All parties cooperated fully in urging substantially the same objections and, for the most part, incorporating or joining in common motions, and points of error. There were no confessions or statements frontally and pointedly made by defendant, Andrews, or Roberts incriminating or attempting to place upon the others the mantle of guilt.

■ We find no merit to defendant's specific contention that he was denied a fair trial because Andrews and Roberts were attempting to bolster their own defenses by emphasizing certain portions of the eyewitness testimony of Orren Walker, who testified Andrews and Roberts were not present at the time defendant shot the victims as well as raped one of them. Defendant claims by attempting to impeach or discredit the credibility of Walker's testimony that sufficient antagonism existed to warrant a separate trial. We believe *State v. Dumas*, Utah, 554 P.2d 1313 (1976), controls here. In *Dumas* we upheld the trial court's refusal to grant separate trials where one defendant alleged that his defense required him to argue that certain parts of the testimony of the State's witness were true which his co-defendant maintained were false.

Defendant claims that the District Court committed prejudicial error by allowing the testimony of George Platco concerning a conversation which he had with Andrews. Platco stated that Andrews said: "One of these days I would like to rob a Hi-Fi-shop and if anybody gets in my way I will kill them." Objection to this testimony was made by defendant's counsel claiming the evidence was hearsay and violated the defendant's rights under the Sixth Amendment, Constitution of the United States. The Court overruled this objection. Further, the Court refused to give a cautionary

or limiting instruction to members of the jury, requested by the prosecutor, admonishing them that the testimony of George Platco was admissible only against Andrews.

On appeal defendant makes challenges to the District Court's rulings. He claims the statement made by Andrews is hearsay and therefore inadmissible against defendant under Rule 63. He also cites *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), claiming the District Court's admission of the evidence inferentially incriminated him, thus violating his right to confrontation of witnesses as guaranteed by the Sixth Amendment. And he makes the argument that the Court's failure to give a limiting instruction inculpated him in the minds of the jurors thus prejudicing his right to a fair trial.

■ As to the hearsay matter, the challenged evidence falls within an exception to the hearsay rule (Utah Rules of Evidence, Rule 63(12)) showing a then existing state of mind, including a statement of intent, plan and motive on the part of Andrews. But defendant persists that it does not apply to him. The record does reveal that the prosecuting attorney specifically stated to the judge, in the presence of the jury, that Platco's testimony was presented by the prosecution only against Andrews. So, defendant's claimed error on this statement must be reviewed in the context of the matters of confrontation and the limiting instruction.

■ Defendant citing *Bruton v. United States*, supra, claims the Court's admission of the evidence inculpated him by inference. We do not think so. Such reliance on *Bruton* is misplaced. In *Bruton* a co-defendant in a joint trial confessed to an armed robbery that he and the defendant Bruton had committed. The court held that the introduction of such a confession where the co-defendant-confessor did not take the stand denied Bruton his right to confront a witness against him. The Court further held

that the error could not be cured through an instruction to the jury to consider the confession only against the confessor as this instruction would not be ". . . an adequate substitute for petitioner's constitutional right of cross-examination." At 391 U.S. 137, 88 S.Ct. 1628. Here, significantly the statement by co-defendant Andrews made no reference at all to defendant. And the statement was made two months before the crimes were committed and no evidence was ever presented linking Andrews and defendant at that early date.

Of course, if *Bruton* were applicable here which, as noted, we do not believe, the limiting instruction would not have been an adequate substitute for defendant's right of cross-examination of Andrews, who did not testify during the guilt phase.

■ Defendant also urges—aside from the issues in *Bruton*—that the failure to give the limiting instruction by the Court impliedly incriminated him in the eyes of the jurors. We agree that there was error in this matter but believe it was not prejudicial.

■ This Court does not interfere with a jury verdict because of error or irregularity unless upon review of the entire record it is determined that prejudice has occurred in a substantial manner, i. e., the error must be such that there exists a reasonable probability or likelihood that there would have been a result more favorable to the defendant in absence of the error.[19]

Whether such errors are prejudicial must be determined from the circumstances in each case. The fact that the Court did not in this case give a limiting instruction did not prejudice the defendant substantially. Any impression by the jury that the statement of Andrews was made in reference to

or implicated defendant was most likely eroded by a statement made by the prosecuting attorney to the trial judge, in the presence of the jury, that Platco's testimony was presented by the prosecution only against defendant Andrews. More importantly, there was such a plethora of direct and circumstantial evidence probative of defendant's guilt that the District Court's refusal to give a limiting instruction could not have had any material bearing on the outcome of the proceeding.

Defendant claims that the District Court erred in admitting certain testimony of Dr. Byron Naisbitt, the husband of the deceased victim, Carol Naisbitt, and father of the injured victim, Cortney Naisbitt. Dr. Naisbitt was called as a witness for the State and gave testimony relating to the events on the day of the crimes and was also questioned concerning the condition and progress of his son Cortney. The defendant objected to this latter testimony on the ground that Dr. Naisbitt, a medical doctor, was not qualified as an expert on the matter. The trial court overruled this objection because of the sufficiency of Dr. Naisbitt's medical expertise and training. Defendant made no other objections then. Following the completion of the doctor's testimony, defendant made a motion for mistrial, which the Court denied, claiming it was error to allow Dr. Naisbitt to testify as to the condition and progress of his son as his testimony was inflammatory and prejudicial.

■ It is within the sound discretion of the trial court to determine whether the probative value of the evidence outweighs the possible adverse effect it might have on the jury,[20] and the discretion on the part of a trial judge to admit or reject evidence should not be interfered with by this Court

**19.** *State v. Johnson*, 25 Utah 2d 160, 478 P.2d 491 (1970); *State v. Winkle*, Utah, 535 P.2d 82 (1975); *State v. Sinclair*, 15 Utah 2d 162, 389 P.2d 465 (1964); *State v. Kelbach*, 23 Utah 2d 231, 461 P.2d 297 (1969); *State v. Seymore*, 18 Utah 2d 153, 417 P.2d 655 (1966); U.C.A. Section 77–42–1, 1953.

**20.** *State v. Poe*, 21 Utah 2d 113, 441 P.2d 512 (1968). Also see Rule 45, Utah Rules of Evidence.

unless manifest error is shown. *State v. Renzo*, 21 Utah 2d 205, 443 P.2d 392 (1968). However, in order to preserve a question for appellate review on alleged error by the trial court, generally a party must object to improper questions and inadmissible evidence at his earliest opportunity. Defendant's objection was not timely made in the instant case as it was not made when the questions were propounded. However, because of the nature of this case (see *Stenback*, supra), we have reviewed this objection but conclude that even if the objection had been timely, there was no abuse of discretion by the District Court. The defendant failed to show the requisite manifest error as required in *State v. Renzo*, at 443 P.2d 399.

■ The evidence was probative and relevant to facts in dispute. Defendant plead not guilty to charges of murder and aggravated robbery. Thus, testimony by Dr. Naisbitt of his son's injuries was relevant to establish the charge of aggravated robbery as well as establish an aggravating factor necessary to the charge of first degree murder.[21]

Moreover, Dr. Naisbitt's testimony as to this necessary evidence was not cumulative. Unlike *Poe*, no previous testimony had established the material facts concerning Cortney Naisbitt's physical condition before and after the incident.

Defendant's sole argument therefore, must be reduced to the contention that the treating physicians would have been less emotional, less inflammatory. Significantly, Dr. Naisbitt's testimony was neither of these. A review of the record reveals his testimony was professional and objective, replete with medical terminology which he never expressed in a prejudicial or inflammatory manner.

Defendant contends that the District Court erred in refusing requested instructions on lesser and included offenses of first degree murder and cites Utah Code Annotated, Section 77–33–6 (1953), in support of his position.

The jury may find the defendant guilty of any offense the commission of which is necessarily included in that with which he is charged in the indictment or information, or of an attempt to commit the offense.

■ The Utah Legislature more recently enacted Section 76–1–402(4), which states:

The court shall not be obligated to charge the jury with respect to an included offense unless there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense.

The statute is explicit that the Court need not instruct on the included offenses unless there is a "rational basis" for conviction thereon. The statute codifies in essence what has long been the rule of law enunciated by this Court, namely that the ". . . jury should be instructed on lesser included offenses when such a conviction would be warranted by any reasonable view of the evidence . . . ."[22]

■ In the present case there was no rational basis or rational inference from the evidence that required the Court to charge the jury with respect to included offenses of first degree murder. The State's evidence showed overwhelmingly at the time of the commission of each of the homicides the defendant intentionally and knowingly caused the deaths of the victims under several or all circumstances specified in Section 76–5–202(1)(b), (c), (d) and (f), at note no. 1, supra. No evidence was presented by either the prosecution or the defense providing a rational basis for conviction of second

---

21. Section 76–5–202(1)(c) states: "The actor knowingly created a great risk of death to a person other than the victim and the actor."

22. *State v. Close*, 28 Utah 2d 144, 499 P.2d 287, 288 (1972). See also *State v. Gillian*, 23 Utah 2d 372, 463 P.2d 811 (1970), and *State v. McCarthy*, 25 Utah 2d 425, 483 P.2d 890 (1971).

degree murder,[23] manslaughter [24] or negligent homicide.[25]

■ The critical difference between murder in the first and second degrees is that the former requires the *actor to cause intentionally and knowingly the death of another under aggravated circumstances* while the latter requires an intentional and knowing death *or* the commission of listed acts of aggravation which cause death *or* recklessness with a depraved indifference to human life which eventuates in death. First degree murder in brief requires a conjoining of "intentional and knowing" with enumerated acts but second degree murder is specified in the disjunctive, thereby not requiring this union.[26]

■ A reading of this record also will demonstrate the complete inapplicability of instructions on manslaughter and negligent homicide. There was no evidence presented by the State or defendant that would show the deaths in this case were caused, as manslaughter requires, by recklessness, extreme mental or emotional disturbance for which there is a reasonable explanation, or a belief by the defendant that circumstances provided a moral or legal justification or extenuation for his acts; nor was there any evidence in this case, as criminal negligence requires, that the deaths were caused by criminal negligence.[27]

As noted above the evidence in this case was overwhelming concerning the elements of first degree murder. There was no evidence which would have absolved defendant from first degree murder.

The District Court committed no error in refusing to give defendant's offered instructions in this matter.

Defendant cites as error the instructions of the Court below concerning the law of first degree murder. He objects specifically to two instructions as being contrary to the provision of Section 76–5–202(1)(c) and (f), at note no. 1, supra.

■ The Court instructed the jury that there were six possible ways in which the

23. Sec. 76–5–203 states: "(1) Criminal homicide constitutes murder in the second degree if, under circumstances not amounting to murder in the first degree or manslaughter, the actor:
 (a) Intentionally or knowingly causes the death of another; or
 (b) Intending to cause serious bodily injury to another, he commits an act clearly dangerous to human life that causes the death of another; or
 (c) Acting under circumstances evidencing a depraved indifference to human life, he recklessly engaged in conduct which creates a grave risk of death to another and thereby causes the death of another; or
 (d) While in the commission, attempted commission, or immediate flight from the commission or attempted commission of robbery, rape, forcible sodomy, aggravated sexual assault, arson, burglary, or kidnapping, causes the death of another person other than a party.
 (2) Murder in the second degree is a felony of the first degree."

24. Sec. 76–5–205 states: "(1) Criminal homicide constitutes manslaughter if the actor:
 (a) Recklessly causes the death of another; or
 (b) Causes the death of another under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation or excuse;
 (c) Causes the death of another under circumstances where the actor reasonably believes the circumstances provide a moral or legal justification or extenuation for his conduct although the conduct is not legally justifiable or excusable under the existing circumstances.
 (2) The reasonableness of an explanation or excuse of the actor under subparagraph (b) or the reasonable belief of the actor under subparagraph (c) of this section shall be determined from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be.
 (3) Manslaughter is a felony of the second degree."

25. Sec. 76–5–206 states: "(1) Criminal homicide constitutes negligent homicide if the actor, acting with criminal negligence, causes the death of another.
 (2) Negligent homicide is a Class A misdemeanor."

26. See *State v. Dougherty*, Utah, 550 P.2d 175 (1976) for a discussion of issues encountered on requested *instructions of included offenses.*

27. See Sec. 76–2–103(4) which establishes the standard of "*gross deviation from the standard of care that an ordinary person would exercise* . . ." as applicable to criminal negligence.

defendant, if he killed intentionally and knowingly, could be found guilty of this crime, which are, in summary: (1) At the time of killing one, defendant killed another, (2) At the time of killing one, defendant intentionally created a great risk of death to others than the victim and himself,[28] (3) The killing was in the perpetration of a robbery, (4) The killing was in perpetration of a rape, (5) The killing was for pecuniary gain,[29] and/or (6) The killing was for personal gain.

As to (2) above, defendant claims that the evidence did not disclose any circumstances which would warrant the conclusion that *at the time* the death of any of the victims was caused either Cortney Naisbitt or Orren Walker was placed in a great risk of death. The evidence fully sustains that the killing of the three victims and the creation of a setting of great risk of death to the two surviving victims occurred within a brief span of time in which were formed a concatenating series of events.

Also concerning (2) above, defendant claims that Section 76-5-202(1)(c) is similar to Section 76-30-3, 1953, which was repealed in 1973 and which stated:

> Every murder . . . perpetrated by any act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life . . . is murder in the first degree.

And that similarity, he contends, compels adherence to an interpretation that this Court placed on the older statute in *State v. Russell*, 106 Utah 116, 145 P.2d 1003 (1944) where it was stated:

> . . . the act which is greatly dangerous to the lives of others must be directed against people generally . . . and not against any particular person . . . . .

We disagree. We believe a careful reading of the Section 76-5-202(1)(c) requires, for first degree murder, *an intentional and knowing killing of one* in circumstances where the defendant creates a great risk of death to another *other than the victim and the defendant*, and therefore the older statute and case above do not govern in this matter.

Defendant also claims error in the instruction pertaining to pecuniary gain, noted above as (5). He contends this instruction overlaps with the instruction given on killing in perpetration of robbery and further that killing for pecuniary gain should be limited to the circumstances of "a hired murder."

No error exists in having two instructions overlap in part.[30] And nothing inheres in the wording "pecuniary gain" which compels the restrictive interpretation defendant places on it.

The defendant asserts that the sentence of death imposed upon him should be vacated because it is disproportionate and excessive in relation to the offenses for which he was convicted and his involvement therein. The circumstances of the offenses and defendant's participation in them have heretofore been related and, we believe, created an episode of extreme cruelty, terror, and atrocity. We therefore reject this argument of disproportionality as inconsonant with the obvious facts which transpired on that tragic April evening and the defendant's role and responsibility in them.

---

**28.** The Court stated on (2): ". . . The State alleges Cortney Naisbitt and Orren Walker were poisoned, shot and Mr. Walker strangled and wounded with a pen and that such acts created a great risk of death to each of them. If it is true as to either of them, it would make the murder of either Carol Naisbitt, Stanley Walker, or Michelle Ansley murder in the first degree . . . ."

**29.** The Court instructed on (5): ". . . It (the killing) would have to be done for the purpose of stealing something of substance as opposed to a mere trifle. The motive for theft would have to be a substantial part of the reason for the killing . . . ."

**30.** *State v. Rodgers*, 7 Ariz.App. 29, 435 P.2d 864 (1967); *State v. Twitchell*, 61 Wash.2d 403, 378 P.2d 444 (1963).

Finally, defendant urges that this case should be remanded to the District Court pursuant to Section 76–3–207(4), at note no. 11 supra, for the purpose of his being sentenced to life imprisonment as his death sentence is unconstitutional. Because of the preceding comments and analyses, we conclude that this position is unmeritorious.

We have endeavored in this opinion, inter alia, to measure the legal system in this State, applicable to defendant, and which was enacted by our Legislature because of the decision and concerns expressed in *Furman,* against the constitutional touchstones pronounced by the United States Supreme Court in order to determine whether that system legally permits the defendant to suffer the imposition of the death penalty. We acknowledge that Utah's system, applicable to defendant, differs in some respects from those systems in Georgia, Florida, and Texas, referred to herein, as these latter three systems differ inter se. But, we believe that this State's system meets the constitutional tests because it is structured to provide reasonably that the unique and irretrievable sanction of death will be mandated by its provisions and processes only in extreme and unusually serious and shocking crimes and when mandated—as here—that the risk of discrimination, arbitrariness, caprice, and irrationality is reduced to a minimum.

For the reasons expressed in this opinion, we hold that the statutory system under which the defendant was sentenced to death does not violate the Constitutions of Utah or the United States and other claimed errors are without merit or unprejudicial.

Affirmed and remanded for further proceedings consistent with this opinion. No costs awarded.

HALL, J., concurs.

ELLETT, Chief Justice (concurring):

I concur in the opinion, but desire to state that I lament and deplore the need for such a long opinion necessarily caused by rulings of the Supreme Court of the United States in cases that I consider to be outside the jurisdiction of that Court. I commend the laborious opinion by Justice Wilkins as being a proper answer to all possible objections to the death penalty in this case.

CROCKETT, Justice (concurring with comments):

In addition to what is said about the charged errors, they impress me as no more than the usual and to be expected attempts to claim error on every possible pretext. I think it particularly applicable here to state that the declared policy of our law is that it should not be obstructed by unsubstantial technicalities; but in the interest in being practical and effective in getting to truth and justice, U.C.A.1953, Sec. 77–42–1 provides:

> Judgment to disregard errors not affecting rights of parties: After hearing an appeal the court must give judgment without regard to errors or defects which do not affect the substantial rights of the parties. If error has been committed, it shall not be presumed to have resulted in prejudice. The court must be satisfied that it has that effect before it is warranted in reversing the judgment.

The decisions of this Court have consistently declared to the same effect. See e. g. *State v. Neal,* 1 Utah 2d 122, 262 P.2d 756; *State v. Sinclair,* 15 Utah 2d 162, 389 P.2d 465.

This same principle is also reflected in the sound and well recognized rule that when the evidence of guilt is so clear that the reviewing court concludes beyond a reasonable doubt that there is no likelihood that in the absence of the claimed errors there would have been a different result, any such error should be regarded as non-prejudicial and the conviction should not be reversed. See *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284, cited in *State v. Scandrett,* 24 Utah 2d

202, 468 P.2d 639 (1970); also see *State v. Carpenter,* 215 Kan. 573, 527 P.2d 1333 (1974); The application of the above-stated rulings to this appeal and to the unspeakably horrendous scenario of crime here involved needs no further exposition.

MAUGHAN, Justice (concurring and dissenting):

With the conviction of the defendant, I concur. I concur with Mr. Justice Wilkins' observation that the mitigating circumstances were "most minimal." However, with the basic premise of his excellent opinion, viz., the death penalty is constitutionally firm, I disagree.

In assessing the constitutionality of the death penalty, the courts have been remiss in applying a valid principle, viz., the legislature in the exercise of the police power must comport with the constitutional standard of reasonableness. The police power connotes the conceptional limit of government encroachment upon societal and private interests.

A law, to constitute a reasonable and proper exercise of the police power, must be reasonably necessary in the interest of the health, safety, morals, or welfare of the people, viz., there must be an obvious and real connection between the provision of the police regulation and its avowed purpose. Furthermore, the means to accomplish the purpose must be appropriate and should not be unduly oppressive; for a police regulation should be no more drastic than is reasonable to accomplish the end for which the law was adopted.[1]

The issue here is whether the legislature could have achieved its objective by a means less drastic than the death penalty.

. . . even though the governmental purpose be legitimate and substantial that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.[2]

The power to prescribe the penalty for the commission of a crime rests with the legislature for it is part of its sovereign power to maintain social order. Traditionally, the rule has been that subject to the constitutional prohibitions regarding excessive fines and cruel and unusual punishments, the legislature may prescribe any form of punishment it wishes for a criminal offense.[3]

There is no rational reason why the principle of substantive due process [4] should not apply to criminal penalties. This principle demands the law to be not unreasonable, arbitrary, or capricious; and that the means selected shall have a real and substantial relation to the object sought to be attained.[5]

In *State v. Mason,*[6] this Court stated:

. . . in determining what is or what is not due process as it affects the ordinary rights which citizens of all orderly governments enjoy, we generally look to see whether the legislation which affects or trammels those rights is reasonably related to and designed to protect the health, safety, morals, or public welfare of the people or any portion of them. This balance between police powers and due process is, therefore, more or less in a state of unstable equilibrium, changing with sociological and economic developments. As the protection of the due process clause recedes, the police power

1. *Sol Block & Griff v. Schwartz,* 27 Utah 387, 405, 76 P. 22 (1904); *County of Spokane v. Valu-Mart, Inc.,* 69 Wash.2d 712, 419 P.2d 993 (1966); *State v. Cotton,* 55 Haw. 148, 516 P.2d 715 (1973); 16 Am.Jur.2d, Constitutional Law, Sec. 278, p. 540; Sec. 279, p. 541; Sec. 280, pp. 543–544.

2. *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960).

3. 21 Am.Jur.2d, Criminal Law, Sec. 590, p. 551.

4. Article I, Sec. 7, Constitution of Utah, Fourteenth Amendment, United States Constitution.

5. 16 Am.Jur.2d, Constitutional Law, Sec. 550, p. 947.

6. 94 Utah 501, 514, 78 P.2d 920, 925, 117 A.L.R. 330 (1938).

advances. There is always articulation between the two. . . .[7]

What is the purpose of punishment for violation of the criminal law?

. . . The great end of punishment is not the expiation or atonement of the offense committed, but the prevention of future offenses of the same kind.[8]

The purposes ascribed to the imposition of penalties are deterrence, reformation, and protection of society.[9] Obviously reformation is not an included purpose for the death penalty.

The death penalty is unique and irreversible. I cannot accept it as merely the severest sanction along the continuum of penalties, commencing with an infraction. The protection of society and deterrence can be achieved by means less drastic than the death penalty.

There have been many reliable studies made, which show the death penalty to be no deterrent.[10] The most recent study is described, by its author, Brian E. Forst, in the Minnesota Law Review, May 1977.[11] This study has been recognized as the most sophisticated and definitive to date. Mr. Forst concludes, "The results of this analysis suggest . . . that it is erroneous to view capital punishment as a means of reducing the homicide rate." Indeed, Forst finds a deterrent in incarceration, but not in death.

Implicit in the history of our society is the concession that the death penalty is no deterrent, to further homicide or other crimes. The concession appears in the steady reduction of capital crimes from two hundred or more, in England shortly after 1800 to abolition in 1965.[12] On our own shores, the concession appears in the reduction from the twelve to sixteen capital offenses of The Massachusetts Body of Liberties and the 1650 Code of the Connecticut General Court,[13] (promulgated by the Puritan Fathers), to outright abolition, in some of our sister states.

In view of the fact, there is no demonstrable evidence the death penalty deters further homicides, the penalty itself is a departure from the avowed purpose of criminal sanctions.

It should be borne in mind that this argument over capital punishment is not new. It has flourished coextensively with the infliction of the penalty. Over this long period of time no reliable evidence of a deterrent effect for the capital sanction, has been developed.

Some 150 years ago, Edward Livingston, who had been engaged by the State of Louisiana to draw its penal code, was of the opinion capital punishment was no deterrent, and recommended against its adoption. He also observed that if society made the spectacle of the infliction of death common it would debase and brutalize the public sentiment, and if it were carried out infrequently it would convert the criminal into a martyr.[14]

One hundred fifty years after that observation, I think we saw an affirmation of it, in the circumstances of the Gary Gilmore matter. The infliction of the penalty, in my view, infuses into the society more violence than it removes.

Livingston's denunciation of the ultimate sanction was not the last. The abolition

---

**7.** Also see *Nasfell v. Ogden City,* 122 Utah 344, 351, 249 P.2d 507 (1952).

**8.** *Hopt v. Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1883).

**9.** 21 Am.Jur.2d, Criminal Law, Sec. 576.

**10.** H. A. Bedau, The Death Penalty in America, Ch. 6; Encyclopedia Britannica, 1964 ed., Vol. 4, p. 847.

**11.** The Deterrent Effect of Capital Punishment: A Cross State Analysis of the 1960's. Vol. 61, No. 5, p. 743.

**12.** Bedau, supra, p. 2; CBS Almanac 1976.

**13.** Annals of America, Vol. 1, pp. 167, 200.

**14.** Annals of America, Vol. 5, p. 84.

movement following him, including Lydia M. Child's, Against Capital Punishment, of 1842,[15] has continued to the present day.

Twelve of our sister states have abolished capital punishment. Their names and dates of abolition are: Alaska (1957); Hawaii (1957); Iowa (1965); Maine (1887); Michigan (1847); Minnesota (1911); North Dakota (1915); Oregon (1964); Rhode Island (1852); Vermont (1965); West Virginia (1965); and Wisconsin (1853).[16]

Numerous statistical studies have been made comparing contiguous states with similar populations, and comparable political, social and economic structures. Some of these states have lacked, some have retained capital punishment; but the homicide rates remain the same and have sustained trends over long periods of time; irrespective of the use or non-use of the capital sanction.[17] If it is deterrence we look for, we do not find it in the death penalty. Are we in Utah more in need of a death penalty than the citizens of the sister states mentioned above?

Although great discretion is conferred on the legislative body to determine what measures and means are reasonably necessary for the protection of the interests of the public, the reasonableness of the means selected must be judged within the context of the uniqueness of the penalty prescribed. The death penalty attains a degree of arbitrariness, because it has no real and substantial relation to the objects sought to be attained, viz., deterrence and protection of society. In contrast, there is no doubt life is an inherent and fundamental right. The only rationalization to support the power of the state to exact the death penalty is vengeance. Revenge is not a function of the law.

The legitimate and substantial purpose of the state to protect society and deter homicide can be achieved by restraint, a narrower means than obliteration of a human life. Therefore, the death penalty violates due process of law, as an arbitrary, unreasonable, and ineffectual method to achieve the desired purpose.

Were there some way to restore the bereaved and wounded survivors, and the victims, to what was once theirs; there could then be justification for the capital sanction. Sadly, such is not available to us.

---

15. Annals of America, Vol. 7, p. 66.

16. Of these states Rhode Island and Vermont retain the death penalty for first degree murder only in specifically restricted situations, viz., while in confinement (Rhode Island); for a second unrelated offense, prison personnel, law enforcement officer in performance of duty (Vermont). In Vermont the penalty may be death or life imprisonment. See: CBS Almanac 1976.

17. Encyc. Brit., Note 10, supra.